SOUTHWESTERN ELECTRIC SERVICE CO. v. NATIONAL LABOR RELATIONS BOARD.

No. 13694.

United States Court of Appeals Fifth Circuit.

March 13, 1952.

940

Summers A. Norman, Jacksonville, Tex., Frank Cain, Dallas, Tex., for petitioner.

A. Norman Somers, Asst. Gen. Cnsl. NLRB, David P. Findling, Assoc, Gen. Cnsl. NLRB and Owsley Vose, Atty. NLRB, all of Washington, D. C., for respondent.

Before HOLMES, BORAH, and STRUM, Circuit Judges.

HOLMES, Circuit Judge.

By its order dated the 28th day of May, 1951, the National Labor Relations Board directed the petitioner to cease and desist (a) from refusing to bargain collectively with the International Brotherhood of Electrical Workers, Local 790, as the exclusive representative of all employees in the petitioner's electrical operations in its Jacksonville, Texas, Division, excluding all employees of its Central Division, iceplant employees, professional employees, clerical employees, guards, watchmen, shift operators, and all other supervisors as defined in the National Labor Relations Act, as amended by the Labor Management Relations Act of 1947, 61 Stat. 136, 161, 29 U.S.C.A. § 141 et seq.; (b) from in any manner interfering with the efforts of said brotherhood to bargain collectively with it in behalf of said unit; and to take the following affirmative action, viz.: (a) Upon request, bargain collectively, and, if an understanding is reached, sign an agreement to that effect; (b) post appropriate notices; and (c) notify the Regional Director within 20 days what steps it has taken to comply with this order.

The petitioner denies that it is engaged in interstate commerce within the meaning of the act; denies the appropriateness of the bargaining unit, and alleges that its establishment by the Board was a gross abuse of discretion, which constituted an arbitrary and unlawful act; denies that a majority of its employees elected said Local 790 as its exclusive representative in accordance with the rules and regulations promulgated by the Board; and denies that it has committed any unfair labor practice or has engaged in any act or omission which in any manner restrained or coerced its employees in the exercise of their rights guaranteed in Section 7 of said act, as amended, or in violation of Section 8(a), subdivision (1), thereof.

Coming directly to what we regard as the crucial issue on review, the petitioner alleges that the election relied on by the union, and referred to in the complaint, was not held pursuant to the regulations prescribed by the Board for the holding of free and fair elections within the meaning of the act; and that said election was, in legal effect, null and void. The Jacksonville Division is a very restricted bargaining unit, having at the time of this election only about 35 eligible voters. In denying petitioner a hearing on its motion to set aside the election, the Board assumed to be true the facts that were offered to be proven in support of the motion, which were as follows: That the witness arrived at the principal voting place at about 7:17 A.M. on the day of the election; that Mr. Ward, representing the N. L. R. B., Mr. Sneed, representing the I. B. E. W. Local 790, and Mr. W. J. Cox, representing the I. B. E. W. Local 790, were already there. The remainder of this witness' testimony will be stated in his own words:

"They had rearranged a steel locker and by moving in a bench and chair, had provided a secret voting booth. I checked the arrangement and found it satisfactory. Mr. Ward then removed the secret balloting box provided by the N. L. R. B. and set it up ready for voting. He then gave further instructions to Mr. Sneed and me as to how the voting was to be carried on and provided the two observers with colored pencils to check the voters as they came in for balloting purposes. He provided each of us, Mr. Ward, Mr. Sneed and me, an official badge identifying us as authorized election officials and requested us to wear them until the election and counting of votes were completed. Mr. Cox remained in the room all of this time. Time was then checked by Mr. Sneed and Mr. Ward, and as there remained about 5 minutes before 7:30 A.M., the officially designated time to begin voting, general conversation continued until one or two minutes before 7:30 A.M. At that time Mr. Cox stepped outside the north

door of the Recreation Room and motioned for Mr. Sneed to follow. They engaged in a low conversation inaudible to those inside. At 7:30 A.M., Mr. Ward called Time and said that voting time had arrived and the polls were officially open for voting. Mr. Sneed then stepped back into the room followed to the door by Mr. Cox who advised Mr. Sneed that 'he might as well go ahead and vote now.' Mr. Cox did not enter the room but stood in the doorway when giving Mr. Sneed the voting advice. Mr. Cox, as far as I know, left the immediate vicinity of the voting place at that time, however, how far he walked away before he stopped, I do not know. Mr. Sneed cast his ballot at that time and the voting proceeded without further incident in the room.

"I did not challenge Mr. Sneed's vote at that time as I did not know whether or not the action of Mr. Cox constituted electioneering or other violation of voting rules and did not wish to create any adverse condition on the part of the Company which could be used by the Union in securing doubtful votes as the election progressed."

The statement of A. A. Croft, which was assumed to be correct for the purpose of overruling the motion, was as follows:

"On the morning of April 27, 1950, I drove to the office (used by me, as Superintendent of Transmission and Distribution, for the past several years) about 7:15 A.M., parked the car and then walked to the dock of the Ice Plant where Fred Minter, our truck driver had parked the Company line truck.

"Fred was filling the water cask used by the line crew for drinking water. My purpose in going to him at the truck was to give him a special permit, issued by the State Highway Department, for hauling poles, and at the same time pick up the old permit which had expired.

"While talking with him about the permit, W. W. (Cap) Barber drove up and parked his car some 60 to 75 feet from us and then walked over to the truck with his lunch kit, which he put on the truck. While we stood there talking about the day's work for some few minutes, Mr. W.

J. Cox, I. B. E. W. representative, came over to the front end of the truck and said, 'Fred, the polls are open. Better go over and vote.' Fred answered him · by saying 'All right, Mr. Cox.' Whereupon Mr. Cox turned and walked to his car parked approximately 50 feet from where he had addressed Fred.

"I then walked back to my office and conferred with D. E. Spencer (Line Foreman) about the previous day's work and the job to be done on this day. After spending some 20 minutes in the office, Spencer and I came out (to go to the storeroom to get materials issued for the day's work) and we there saw Mr. W. J. Cox standing near his car parked on company property at the entrance of the plant property, the time being approximately 7:50 A.M., and all our crew having arrived by now, the storeroom man proceeded to fill our order, then the crew loaded the truck and left for work at approximately 5 minutes after 8:00 o'clock."

The Board summarized Cox's activities as follows: "Shortly before the opening of the polls, Cox, the Petitioner's international representative, who had been present with others checking the arrangements for voting, held a conversation with the Petitioner's observer outside one of the doors of the polling place. Just as the polls opened, Cox followed the observer to the door and called to him that 'he might as well go ahead and vote.' Cox then proceeded to his car, parked just inside an entrance to the Employer's property. On the way, he paused at the ice plant dock, where the Employer's line truck driver was engaged in conversation with one of the Employer's superintendents, and called to the driver, 'Fred, the polls are open. Better go over and vote.' Cox then proceeded to his parked car, and remained there for sometime in clear view of the polling place and in a position where employees passed by and talked with him on their way to the balloting."

In moving that the election be set aside or that a full hearing be held, the petitioner alleged that a union official not an employee of the company electioneered at and near the polling place; that he placed himself near the polling box in the direct path of

employees going to vote, and where they would necessarily have to pass him; that employees did pass him and talk to him just prior to casting their ballots; that this conduct continued throughout the balloting in clear view of the polling place, and constituted a violation of a material election rule and an interference with the freedom of choice guaranteed by the act to employees.

The result of the election was certified as follows:

> "Approximate number of eligible
> voters ....................... 35
> Void ballots .................... 0
> Votes cast for I. B. E. W. Local
> 790 ......................... 17
> Votes cast against participating labor organization ............... 14
> Valid votes counted ............. 31
> Challenged ballots .............. 3
> Valid votes counted plus challenged
> ballots ...................... 34

"Challenges are sufficient in number to affect the result of the election. A majority of the valid votes has [not] been cast for International Brotherhood of Electrical Workers, A. F. L. Local 790."

The Board sustained two of the challenges, but failed to decide the third. If the tables were turned, and a representative of the Company had done exactly what was done here, with a result favorable to the employer, the election should be set aside; and the same rule must apply in this case, where a free and fair election was interfered with by the activities of the union representative within the prohibited area. The polls on this occasion were open only from 7:30 A.M. to 9 A.M. Cox was there at least 10 or 15 minutes before the polls were open, and remained in the polling area for a comparatively long time after the voting began, giving directions to the election officers and to the voters. A change of one vote might have changed the result of the election, and a change of two votes certainly would have done so.

The notice of election published by the Board stated that voters would be allowed to vote without interference, restraint, or coercion; and that electioneering would not be permitted at or near the polling places. This requirement was not sufficiently observed by the representative of the International Brotherhood of Electrical Workers. There are other serious questions in the case, but it is unnecessary to decide them.

The petition to review the order of the Board is granted, the petition to enforce denied, the order set aside, and the complaint dismissed.