## NATIONAL LABOR RELATIONS BOARD

v.

### WEST TEXAS UTILITIES CO.

#### No. 14865.

United States Court of Appeals
Fifth Circuit.

July 9, 1954.

Bernard Dunau, Atty., A. Norman Somers, Asst. Gen. Counsel, David P. Findling, Associate Gen. Counsel, George J. Bott, Gen. Counsel, Rose Mary Filipowicz, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Frank Cain and Lee Smith, Dallas, Tex., Irion, Cain, Bergman & Cocke, Dallas, Tex., of counsel, for respondent.

Before HUTCHESON, Chief Judge, RIVES, Circuit Judge, and DAWKINS, District Judge.

DAWKINS, District Judge.

This is a petition by the National Labor Relations Board for enforcement of its order directing respondent, West Texas Utilities Company, to bargain with Electrical Workers Locals 898, 920 and 1044, AFL, called Union, dated August 25, 1953, under the National Labor Relations Act.[1]

Respondent based its refusal to bargain upon some ten points, which really resolve themselves in two: (1) the arbitrary and inappropriate composition of the bargaining unit, and (2) the unfair and biased conduct of the Board's agents in holding the election.

1. On July 18, 1951, the Union initiated the creation of the unit by filing its application to represent "all power

1. Section 10(e), 61 Stat. 136, 29 U.S.C.A. § 141 et seq.

plant employees" in employer's production department, and excluding "office and clerical employees, guards and watchmen, professional employees, and all supervisors as defined in the Act". Hearing was had on September 5th following, at which respondent opposed the suggested unit, insisting (1) that it should include not only employees in the power plants, but also those in the transmission, distribution and service departments, (2) that it should be enlarged by adding metermen, relay men, substation operators, patrolmen, radiomen, tank men and shop workers.

The Board approved the unit requested by the Union.

Respondent insists that the Board acted arbitrarily and capriciously, for the reason the order was not supported by substantial evidence, and was contrary to the Board's practice and policy; that the only evidence at the hearing for determining the character of the unit was that by respondent which disclosed that the employees in its distribution, production, transmission and service departments were interchangeable and worked accordingly; that any other arrangement by which some of these employees were left out or placed in another unit would cause confusion and conflict in the matter of working conditions, wages, hours, etc. It also called attention to the fact that the Board had, in 1946, approved a unit embracing all employees contended for by respondent, but it appears in that instance it was done by consent of the parties. The Board further pointed out that on another occasion it had refused to approve a unit embracing a single plant of respondent.

■ An examination of the record discloses that some of the employees, in the categories contended for by respondent, were already represented in other units, and while a different set-up might have been more convenient for respondent and advantageous to some employees, the one selected cannot be said to be without reasonable basis. Of course, the employer's methods of doing business and practices with respect to interchanging of employees, making up payrolls and dealing with its employees as to wages, hours and conditions of work, are entitled to consideration. One of the main purposes of the law is to insure "freedom in exercising their rights" by employees, and the Board's action should not be disturbed except in a clear case of abuse of discretion. The power to select the unit has been committed to the Board by the Act and we do not find any arbitrary or gross abuse of that discretion. As was said by this Court in N. L. R. B. v. Smythe, 5 Cir., 212 F.2d 664:

"It is not denied that the broader bargaining unit contended for by respondent would be an appropriate unit. However, neither respondent nor this court has the function to determine whether a more appropriate unit than that certified by the Board would 'assure the employees of the fullest freedom in exercising the rights guaranteed' them by the Act. Congress has authorized the Board to make this determination and has vested in it a wide discretion to do so. Such determination is binding upon us unless the Board has abused this discretion or otherwise violated the mandate of the statute. We find no such abuse here * * *."

See also Packard Motor Car Co. v. N. L. R. B., 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040.

■ Respondent complains that in the notice of the election the Board used the expression "power *house*" employees instead of power plant, which it illegally attempted to change, thereby creating confusion among its employees as to who was entitled to vote. The attempted correction was by telegram from the Board instructing the erasure of "house" and the insertion of "plant" when the very notice itself warned that no one had any power to make any change. It is true that there were some 213 eligible voters in the proposed unit and that only 152 actually voted. However, in the present state of the record we do not find sub-

stantial proof that others were kept away from participating in the election because of this mistake in the notice in so far as the creation of the unit was concerned. We therefore conclude that the objection to the unit should be overruled.

2. The election ordered by the Board was held at 18 different places in a wide area, some separated by hundreds of miles, in the State of Texas, on December 19 and 20, 1951, and on the latter date the results were immediately tabulated and certified by one of the Board's three agents who conducted the election, John F. White, as follows:

"Approximate number of eligible
    voters                213
"Void ballots                1
"Votes cast for Union      59
"Votes cast against Union  47
"Valid votes          106
"Challenged ballots     45
"Valid votes counted plus challenged ballots       151."

(R. 37)

On December 28th following, respondent filed its objections:

(1) That there was a mistake in notice of election above mentioned which read:

"THOSE ELIGIBLE TO VOTE:

"All *power house* employees in employer's production department who were employed for 90 days immediately preceding November 29, 1951."
(Emphasis by the writer.)

Respondent contended that this was calculated to confuse the employees as to who was eligible, the expression "power house" being a term unknown to the company, and never used by either the company, its employees or the Union; that it filed objections with the Board and it was ordered by the Washington office that "house" be scratched out and "plant" substituted in spite of the fact that the notice itself stated plainly "This is the only official notice of this election and must not be defaced by anyone"; and that this change and posting

of the telegram from the Board, along with the notice, caused "utmost confusion as to who was eligible to vote".

(2) That on several occasions more than one person was allowed in the polling places at a time, and that voting procedure, challenges, unions, etc., were fully discussed in the presence of persons voting and waiting to vote, which also added heavily to the "confusion and misdirection".

(3) That the agents of the Board stated on numerous occasions they had, before starting the election, determined to categorically challenge all company employees who were employed in diesel power plants; that they did so challenge employees, "some before they had received their ballots, some after they had received their ballots and before they had marked the same and some in the presence of other employees", from all of which at least some of the employees were bound to have an impression that the election was biased, no matter how their ballots were cast.

(4) That the ballot boxes were tampered with.

(5) That over the protests of respondent's observers the agents of the Board "cross-examined employees who were about to vote * * * in such manner as to leave no doubt in the minds * * of the voters that the Board was prejudiced on the side of the Union * *", thus influencing the result.

(6) The agents of the Board allowed employees who had already voted and who had no official position but "who had, in no uncertain terms, stated their preference for the Union" to also cross-examine other employees who had not voted "as to the nature of their duties and amount of time spent in certain types of work", all over the objection of respondent's observers.

(7) That there was manifest bias of the Board or some of its agents toward the Union.

(8) That there was ambiguity in the definition and designation of the bargaining unit.

The Regional Director, at the suggestion of respondent, fixed a hearing on these objections for January 3, 1952. It was later extended to January 8th, but respondent had not yet presented its proof and the Director handed down his decision without it, consisting of some 25 to 30 mimeographed pages, giving much of the details furnished by White, but stating, "challenges are sufficient in number to affect the result of the election". He further recited that certificates of approval had been signed by the Board's representatives, by the observers for the Union and for the employer as to the elections at Alpine, Marfa, Presidio, Marathon and Girvin, conducted by agent Lewis A. Ward, but that the observers or representatives of respondent had refused to sign those conducted by John F. White and Sulton J. Boyd "on the ground it (they) was (were) in error". The Regional Director further stated that "he (the respondent) did not see fit to include this contention in his objections to the election. Accordingly, it is not considered herein."

The report then discussed the objections for some 14 pages which appear in the record (R. pp. 50–63), ending with the statement:

"In the opinion of the undersigned, and for reasons stated above, none of the objections constitute material and substantial issues with respect to conduct affecting the results of the election or to conduct of the election, and it is recommended that each and all of the objections be overruled.

"(Pages 42 thru 58 omitted)"

On January 15, 1952, the Board extended the time for filing "exceptions and objections to the Regional Director's report in Washington * * *", and on January 25th they were filed. Attached thereto were some 62 affidavits as to the conduct of the election by the Board's agents and the eligibility of those voting, the nature of which will be later considered. The Board on February 19th following filed a Supplemental Decision and Order, reciting that the parties had been furnished a tally of the votes showing that of the 152 cast, 59 valid ones were for the petitioner (Union) and 47 were against it, with 45 challenged, and one void ballot. The Board attached lists in three categories of the challenged ballots, marking them Schedules A, B and C, respectively. Schedule A consisted of 12, as to which it stated that challenges had been sustained by the Regional Director without exception by either side and the ruling was therefore affirmed. The objections to Schedule B, consisting of three ballots, were overruled, and for the same reason the Regional Director was affirmed. However, as to Schedule C, consisting of 30 challenged ballots, the Board ordered:

"The Employer excepts, however, to the Regional Director's recommendations with respect to the employees listed in Schedule C. As substantial issues of fact are raised with respect to these employees, we shall direct that a hearing be held for the purpose of obtaining evidence with respect to the duties of these employees, and we shall further direct that the hearing officer designated for the purpose of conducting the hearings, prepare and cause to be served upon the parties, a Report containing resolutions of the credibility of witnesses, findings of fact, and recommendations to the Board as to the disposition of the said challenged ballots."

The Board redefined the entity for bargaining as including:

"All power plant employees in the Employer's production department, including all employees who operate or maintain diesel engines, but excluding office clerical employees, shift engineers, guards, watchmen, professional employees, and supervisors."

(Of course, this was long after the election and it could effect none of those who failed to vote believing they were

not among those eligible to do so; and would apply only to those in the stated categories who had actually voted, whether challenged or not.)

The Board instructed the Regional Director, within ten days, to open and count the ballots in Schedule B (three in number), and otherwise remanded the "proceeding * * * to the Regional Director * * * for the purpose of conducting hearing on the issues raised by the employer's objections, with respect to the challenged ballots in Schedule C * * * *". It further ordered that the officer designated "prepare and cause to be served upon the parties a report containing resolutions of the credibility of witnesses, findings of fact and recommendations to the Board as to the disposition of the challenged ballots" and further that "within ten days of the receipt of such report any party may file with the Board in Washington, D. C., * * * exceptions thereto," copies to be served upon the opposing parties (R. 112). Nothing was said and no action was taken on the respondent's objections to the election.

The Board's decision was dated February 19th, as stated, and the Regional Director designated John F. White, one of those who had represented the Board in the election, whose misconduct had been raised in the objections, as the agent to recount the challenged ballots in Schedule C, and in the notice of hearing, stated it included respondent's charges as to the unfairness of the election. Six days later, on February 25th, (R. 113) White filed his "Revised tally" which was the same in form as was contained in his original report on the 20th of December, except that he found 61 (two added) valid votes had been cast for the Union and 48 (one added) against it, increasing the total valid votes from 106 to 109 and reporting "unopened challenged ballots—42". Two days later, on February 27th, (R. 117) White filed "an amended revised tally" in which the figures were exactly the same, except that 12 votes were deducted from unopened challenged ballots, leaving 30 and

adding just before his signature, "Challenges are sufficient in number to affect the results of the election."

On March 6, 1952, Edwin A. Elliott, the Regional Director, issued notice that a hearing "before a hearing officer" would be "held in the City of Marfa, Texas, on the 17th day of March, 1952, upon the employer's objections to the Regional Director's report *on objections to election* and challenged ballots" (Emphasis added), pursuant to the Board's order on February 19th referred to above, "at which time the parties will have the right to appear in person or otherwise and give testimony on the issues raised by said order."

■ (Unfortunately many of the documents in the record are undated, and the manner and order in which they were transcribed therein has required much labor and research on the part of the Court in attempting to get an orderly picture of what happened. It is suggested that in the future, every document, particularly reports and orders of the Board, pleadings, exceptions, etc., be dated and copied into the record consecutively in the order in which they were filed and considered.)

Notice of the hearing to be held on the 17th day of March was accordingly given. Thereafter the next thing that appears in the record is a motion by respondent's counsel to correct the wording of two questions and answers which were sworn to in the supporting affidavit on April 19, 1952, and this is followed by a motion of the same counsel to be permitted to attach and make a part of this record "this brief. The basis for this motion is that the brief is tendered in lieu of oral argument, for which there was no opportunity at the end of the hearing."

On April 30th the hearing officer issued an order to show cause in the matter of correcting the record and that the brief by respondent be "received and given consideration * * *". We find no record of any hearing pursuant to the Board's order of March 6, 1952, but the

next thing in the record is a "second supplemental decision and direction," dated July 18, 1952, dealing first with the challenged votes and then reciting:

"A hearing was held between March 17 and 26, 1952, before Richard C. Keenan, hearing officer."

\* \* \* \* \* \*

"The Employer also filed a Motion to Reopen the Hearing for the purpose of submitting further evidence or affidavits.

"We hereby deny the Employer's Motion to Reopen inasmuch as it appears that the further evidence or affidavits which the Employer proposes to adduce would be merely cumulative and repetitious."

Otherwise the report dealt with the challenged ballots but concluded:

"It is further directed that if the Revised Tally of Ballots shows that the Petitioner has won the election, the said Regional Director shall so report to the Board *and refrain from issuing a Certification of Representatives to the Petitioner until after the Board has finally disposed of the objections to the election filed by the Employer*." (Emphasis added.)

There next appears in the record the Board's "Third Supplemental Decision and Certification of Representatives" dated September 4, 1952. It recites that the respondent had filed its objections to the election on December 28th, as to which the Regional Director had reported on January 8, and that on January 25, "the employer filed exceptions thereto"; that on February 19 it issued a supplemental "decision, direction and order" with respect to challenged ballots "\* \* \* *reserving ruling on the employer's objection to the election*." (Emphasis added.) The Board further stated that on February 19, it had entered a supplemental order "reserving ruling on the employer's objection to the election"; and that subsequently on July 18, 1952, it had disposed of the remaining challenges, which left a total of 65 ballots cast for and 57 against the Union. It then stated:

"*Objection No. 1.* The Employer contends that the unit description in the notices of election was misleading, in that it referred to 'power house' rather than 'power plant' employees, thereby allegedly creating uncertainty as to which employees were eligible to vote. However, a communication from the Regional Director authorizing the term 'power house' in the election notice to be changed to 'power plant' was posted by the Employer alongside the original election notices. We believe that this was sufficient to remove any doubt in the employees' minds as to the scope of the unit. Accordingly, we find no merit in this objection and it is hereby overruled.

"*Objection No. 2.* The substance of this objection is that one of the three Board agents conducting the election insisted that all the voters be admitted to the polls at the same time and that the eligibility of each voter be discussed before giving him a ballot, that one voter was permitted to cross-examine a prospective voter with 'evident emphasis and bias in favor of the union,' and that on one occasion a Board Agent advised a group of prospective voters that they would all be challenged. We fail to perceive how the conduct complained of could have violated the secrecy of the ballot or otherwise interfered with a free choice in the election. The 'cross-examination' incident was denied by the Board Agent, and, in any case, the Employer's characterization of the nature of this cross-examination, unsupported by specific details as to the language used, is not sufficient, in our opinion, to raise a substantial or material issue with respect to the conduct of the election.

"*Objection No. 3.* In this objection the Employer again contends that the Board Agents had determined in advance of the election to

challenge, and did challenge, all employees in the diesel power plants. Assuming this to be the case, such challenges would not necessarily reflect, or indicate to the voters, any bias in favor of the Petitioner. There is no evidence as to the attitude of these diesel employees generally to the Union, or that such attitude was common knowledge among the other employees. It is accordingly difficult to understand how any inference of pro-union bias could be drawn by the voters from these challenges or the manner in which they were made. Moreover, as already stated, in view of the uncertain eligibility status of the diesel power plant employees under the Board's original Decision herein, the policy adopted by the Board Agents of voting all such employees under challenge was reasonable and proper.

"*Objection No. 4.* This objection is based on the fact that an observer for the Employer, in testing the security of the ballot bag, succeeded in jerking it free from its metal holder. However, it is not disputed and the bag was promptly re-sealed by wrapping tape completely around the bag so that it was physically impossible to open the bag without breaking the seal.

"*Objection No. 5.* The Employer contends that the Board Agents extensively cross-examined prospective voters as to their duties, that a close personal relation existed between the Board Agents and an organizer for the Petitioner, as well as with the union observers, that the views of an observer for the Employer were not noted on the challenge envelopes, that he was not allowed to participate in the examination of voters, and that he obtained the impression that the Board Agent was biased.

"These allegations and the supporting affidavits do not in our opinion raise any substantial or material issues with respect to the conduct of

the election. Personal acquaintance of a Board Agent with a union representative is not, in itself, sufficient basis for setting aside an election. The statements in the affidavits of the Employer's observer that the Board Agent questioned the voters in such a way as to manifest bias are merely statements of conclusions, unsupported by any reference to specific language used by the Board Agent. *It does not appear in what manner any voters could have been influenced by the the alleged limitation placed by the Board Agent on the interrogation by the Employer's observer of voters whose ballots were challenged, or by not recording such observer's comments on the challenge envelopes. Nor is it clear how the Employer was otherwise prejudiced by this alleged conduct. The Employer had adequate opportunity in its exceptions to the Regional Director's Reports and in its briefs to the Board to express its views with respect to the challenges.* (Emphasis added.)

"*Objection No. 6.* This objection again refers to the fact that certain voters were permitted to examine prospective voters concerning their eligibility to vote. Only one instance of this sort is cited in the supporting affidavits, which is the same incident already discussed in connection with Objection No. 2.

"*Objection No. 7.* The Employer here contends generally that some of the Board Agents manifested bias in favor of the Union. In support of this contention, the Employer relies only on the incidents discussed above.

"*Objection No. 8.* This objection is based on the alleged ambiguity in the definition of the unit in the Board's original Decision herein, specifically, the failure of the Board in that Decision to clarify the status of the diesel engine operators. However, the Regional Director, recognizing this fact, made arrange-

ments for the diesel engine operators to vote subject to challenge, and many, if not all, of them did in fact vote."

We find nothing in the record to support this last statement.

It thus appears rather clearly that although the Regional Director in the "Notice of Hearing on Exceptions" stated a hearing would be held at Marfa, Texas, on the 17th of March " * * * upon employer's exceptions to Regional Director's report on *objections to election* * * * pursuant * * * to the order of the Board entered on February 19, 1952, *at which time and place the parties will have the right to appear in person or otherwise and give testimony on the issues raised by said order"*, there is nothing in the record to show such a hearing was held except the recital by the Regional Director in his report. In fact it is vigorously disputed by respondent.

The gravamen of the respondent's complaint is the failure to hold such a hearing, at which it could not only present its proof orally by witnesses under oath, as to the misconduct of the Board's Agents, but would also have the right to call those agents for examination under oath in an attempt to show their extreme bias in favor of the Union reasonably calculated to operate in its favor with the voting employees. Evidently the Regional Director had before him only the 62 affidavits filed by respondent since the agents charged with misconduct were not called upon to testify. On the contrary, it appears the decision was made upon the assumption that even if this evidence was supplied, in addition to the affidavits, the same would not warrant setting aside the election.

This makes it necessary for us to consider at least some of the matters sworn to in these affidavits. See footnote.[2]

The Board and all of its hearing agents should understand they are not the representatives or partisans of either side in holding an election, or hearings in which representation of employees is

2. Louis S. Gee, an observer for the employer, traveled with Agent Boyd over the area, and was present at the places where the latter conducted the election.

"All through the election, over my protest, Mr. Boyd insisted that all voters be allowed in the voting place at the same time and that discussions be held as to legal status and eligibility of each voter before giving him a ballot.

"All throughout the travel to the various polling places Mr. Haney, the union observer, and Mr. Boyd discussed their friendship and personal relations with Mr. J. W. Null, the International Brotherhood of Electrical Workers union organizer. They had both visited his farm and were very familiar with the entire layout of the property and were evidently very intimate with Mr. Null."

Gee swore that similar tactics were followed in the case of voters Powell and Walker; that a question arose between him and Boyd as to the sufficiency of the bag into which the ballots after voting were placed, and the latter invited Gee to test its strength, which was done and the bag was easily broken open after which it was mended with tape. The Un-

ion's observer, Haney, and Boyd, the agent, discussed in the presence of voters an invitation by the former for Boyd to have dinner in his home. The affiant did not know whether this took place or not.

On the last day of the election, December 20th, the affiant and Boyd had breakfast together, during which Boyd stated, "The best way for the company to get along with its employees was to have a labor union with a closed shop. He said that the union had fifty to sixty million dollars to fight our company with and in his opinion, we could not possibly win any controversy that we might have with them."

The second affidavit was by C. P. Stearns, who stated that on the first day of the election, about 8:30 P.M. at Lake Pauline station, Agent White stated that "he intended to challenge every vote at the diesel engine stations" and that "each vote at Childress, Wellington and Shamrock was" so challenged by White, on the ground "their varied duties fall in the jurisdiction of two or more voting units." Again "each voter was cross-examined extensively by Mr. White * * * in the presence of other voters who had not yet had an opportunity to vote". At Welling-

sought. This is particularly true here because the Board, in part at least, is endowed with all the three great powers of government, legislative (making rules for procedure), judicial (deciding the vital and important issues arising between employer and employee as well as between either of these and the union), and executive (initiating proceedings for enforcement of its decrees). We may take note of the widely held view that the Board's and its agents' failure to appreciate their proper functions and to impartially administer these powers, had much to do with the change in the National Labor Relations Act in 1947. In the discharge of their judicial functions they sit as judges to hear issues of fact and to apply the Act in matters of the highest importance to all concerned. In proceedings before them, the law provides a general counsel to perform the functions of the advocate, who, of course, like a district attorney, is also under oath to urge only what he thinks is right and just when tested by the statute and the decisions under it. We do not overlook the fact that the Board also performs ministerial duties such as are involved in part here, the conducting of elections at which employees may exercise their high privilege of saying who, if anyone, shall represent them in collective bargaining with their employer. The employer is forbidden to use any promises or threats to influence the employees' action, and it is the Board's duty to see that those requirements are observed. At the same time, the union which seeks to have the employees select it as their representative is not permitted to resort to coercion or other unfair means to that end, either with or without the Board's consent. However, under the present law either the employer or the union may appeal openly to the worker's judgment as to why he should or should not select a union as his legal representative, so long as it is done without resort to unfair means, as declared in the statute. In this delicate balancing of the statutory rights, the Board and its agents have the single duty of seeing that every safeguard is observed to insure the exercise by the workers of an independent choice. No one charged with this responsibility should throw the weight of his official position into the scale either way.

In the light of this statement of the Board's duties, let us see what there is in the record which can reasonably be said to establish a failure by the Board and its agents to conform to such standards. In the set-up for conducting the election, each side was accorded the right to have present "observers" to see that only those who rightfully were entitled to vote should participate, by challenging any they believed were not eligible. In the mix-up as to what employees should be included in the Board's notice of election, which it finally cleared up weeks thereafter in one of its rulings as above pointed out, it was not improbable that whole groups may have refrained from participating because they thought they were not entitled to do so. In conduct-

---

ton he told the voters he "was going to challenge them all". The affiant complained to White that the voters "might be intimidated" by this course but the latter stated he "intended to continue such questioning anyway". The affiant further reminded White that the union observer had also questioned Mr. Layton Holt, a voter, and that White recalled the incident and stated "he probably should not have allowed him to do so."

There appear in the printed record some 13 additional affidavits (Nos. 3, 4, 6, 7A, 9, 15, 19, 21, 32, 38A, 48, 52 and 56) dealing mainly with the nature of the duties both of the affiants and of others, in the defendant's plant for the purpose of supporting the right to vote or not, which affidavits were evidently intended to be considered in counting and determining the validity of the ballots cast. The last affidavit in the printed record, No. 56, was by Frank Drummond, who stated:

"While I was voting, the Board member would question me but the questions would be answered hastily by the union observer before I could answer. The union observer is also a member of the plant crew (employed less than one year) and must have figured he could answer my questions better than I."

ing the election, the proper course for what may be termed the presiding officer, was to permit the observers to do the challenging and to attach to the ballots brief statements of the grounds. He should not have, himself, or permitted others to engage in questioning and arguments with the proposed voters, but it was his duty to leave the decision thereof to the judgment of those who would be charged subsequently with the counting of the ballots and determining the results, under conditions where it could be done without pressure. It was no part of the duties of the Board's agent to question any applicant's right to vote, but simply to make a correct record. This is the course ordinarily followed in political elections. We know that the Board, like the Courts, has a large volume of work of this kind to handle, and that reasonable latitude should be allowed to ascertain the facts and to reach just conclusions without strict conformity to the methods of a judicial trial. However, the object in both instances is the same, that is, to afford a fair and just hearing to see that the sworn evidence preponderates in favor of the conclusion reached. In no other way can the rights of all parties be protected.

We give in footnote No. 2 the substance and in some instances quote from affidavits submitted by respondent to support its objections to the election.

It is impossible for anyone to say, in view of the state of the record, the precise effect of such improper conduct by the agents on the election. There was no record made, of course, of what took place in the election places, and the witnesses had to depend, in making their affidavits, upon their recollection of what had happened days and weeks earlier. However, the affidavits show wanton misconduct on the part of the Board's agents. The question is, should we give the stamp of our approval to denying respondent an opportunity to have its witnesses testify at an open hearing and to require the agents to submit to public examination under oath as to their conduct. All that appears to the contrary is the statement by the Board in its "Third Supplemental Decision and Certification of Representatives" that the: " 'Cross-examination' incident was denied by the Board Agent." Of course, the charge was made against two agents, Boyd and White. Further, there is no showing that these agents were under oath when they made their statements to the Regional Director. The respondent should have been permitted to have them make it under oath and to confront them with the testimony of those who said they did, so that if the proper authorities see fit, possible perjury charges might be made against either the witnesses or the agents. In no other way could the integrity of such proceedings be preserved and the rights of the parties be protected against perjury.

There is more at stake in this case than whether the result was influenced by the conduct of the agents, especially in view of the fact that the union victory rests on the very slender margin of eight votes (65 in favor of the union and 57 against it) making altogether 122 ballots cast and counted as valid, out of a stated eligible list of 213 and 151 cast. We also find nothing in the printed record of the evidence upon which the Regional Director finally disposed of all challenged ballots.

■ From what we have said above, it sufficiently appears: that respondent was denied due process by the inadequate and ex parte method of investigating and disposing of its exceptions and charges; that the finding of the Board that the Union was duly elected and the respondent was guilty of unfair labor practices in not recognizing it as representative of its employees is without legal support in the record; and that enforcement of the Board's order should be and it is denied.[3]

3. N. L. R. B. v. Sidran, 5 Cir., 181 F.2d 671; South Western Electric Service Co. v. N. L. R. B., 5 Cir., 194 F.2d 939; and N. L. R. B. v. Trinity Steel Co., 5 Cir., 214 F.2d 120.

RIVES, Circuit Judge: I concur specially.

RIVES, Circuit Judge (specially concurring).

As to the first proposition, the composition of the bargaining unit, I am in full agreement with my brothers.

The petition before this Court is for the enforcement of an order directing the respondent to bargain collectively with the Union as the exclusive representative of its employees, a duty imposed upon the respondent by 29 U.S.C.A. § 158(a)(5), if the Union has been legally and properly certified as such representative. The question is whether the certification of the Union as representative of respondent's employees was a legal certification. Under the Act, this is the first occasion on which that question could be decided by the Court. 29 U.S. C.A. § 159(d); A. F. of L. v. National Labor Relations Board, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347; Pittsburgh Plate Glass Co. v. National Labor Relations Board, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251.

Before this Court can say that the certification was not legal, it must be of the opinion either that the Board made an error of law in making the certification or that the findings of the Board with respect to questions of fact were not supported by substantial evidence on the record considered as a whole. 29 U.S. C.A. § 160(e).

The Board directed a hearing upon the material issues of fact raised with respect to 30 of the challenged ballots, and disposed of the challenges on that hearing. The Court is presented with no issue as to the challenged ballots.

The Board found that the respondent's objections to the conduct of the election did not raise substantial and material issues and that no formal hearing was necessary.[1] In effect the Board rendered summary judgment against the respondent on its objections to the conduct of the election. Those objections, supported by affidavits, seem to me to raise substantial and material issues as to whether the election had been so unfairly and improperly conducted that it could not be said to reflect the full and free expression of the will of the employees, and hence should be set aside. I think that the Board abused its discretion in not according the respondent a hearing on its objections to the conduct of the election.

The main opinion contains some statements as to the duties of the Board's agents in the conduct of the election, such for example as the following: "It was no part of the duties of the Board's agent to question any applicant's right to vote, but simply to make a correct record." I am not sure that that is correct. The conduct of the election is a matter entrusted by the Act to the Board, and it is no part of the function of the Court to instruct the Board in the details of such conduct. Not being in entire agreement with all that is said in the main opinion, but thinking that the Board erred in certifying the Union as the representative of respondent's employees without having first accorded the respondent a hearing on its objections to the conduct of the election, I concur specially in denying enforcement of the Board's order.

---

1. This was in accordance with Section 102.61 of the Rules and Regulations which provides that:
   "If exceptions are filed * * * and it appears to the Board that such exceptions do not raise substantial and material issues with respect to the conduct or results of the election, the Board may decide the matter forthwith upon the record, or may make other disposition of the case. If it appears to the Board that such exceptions raise substantial and material factual issues, the Board may direct the regional director or other agent of the Board to issue and cause to be served upon the parties, a notice of hearing on said exceptions before a hearing officer. * * *."