RUSSELL-NEWMAN MFG. CO., Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 22955.

United States Court of Appeals
Fifth Circuit.

Dec. 27, 1966.

Rehearing Denied Jan. 25, 1967.

Fritz L. Lyne, Lyne, Blanchette, Smith & Shelton, George C. Dunlap, Dallas, Tex., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Janet A. Kohn, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Glen M. Bendixsen, Atty., N. L. R. B., Washington, D. C., for respondent.

Before BROWN, COLEMAN, and AINSWORTH, Circuit Judges.

COLEMAN, Circuit Judge:

The petitioner, Russell-Newman Manufacturing Company, Inc., seeks review of an order of the National Labor Relations Board dated July 6, 1965, reported at 153 N.L.R.B. No. 105. The Board cross petitions for enforcement. The Board found that during a Union organizing campaign the company violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., by threats of reprisal and by granting benefits during a Union organizing campaign. At this point, we deny enforcement and remand the case to the Board for further hearing consistently with the views herein expressed.

In May, 1964, the International Ladies' Garment Workers Union, AFL–CIO, began organizing the employees at the company's plants in Denton and Pilot Point, Texas, locations situated about eighteen miles apart. On May 29, 1964, company vice-president Martino addressed employees in the Denton plant. The Board, over-ruling the Trial Examiner, found this address to have been coercive, a matter which we shall discuss later.

The original charge in Case No. 16–CA–2116 was filed August 28, 1964. Another charge was filed September 21, 1964, and assigned Case No. 16–CA–2138. On October 23, 1964, an amended charge was filed in Case No. 16–CA–2116. On October 30, 1964, the Regional Director consolidated the cases and issued a complaint in which he alleged only the following violations against the company:

"Since on or about April 20, 1964, and continuing to date, Respondent has interfered with, restrained and coerced, and is interfering with, re-

straining and coercing, its employees in the exercise of rights guaranteed in Section 7 of the Act by the following acts and conduct:

(a) On or about August 6, 1964, Respondent by its supervisor and agent Kenneth Griffith, orally threatened its employees at its Pilot Point plant with discharge if they became or remained members of the Union or gave any assistance or support to it.

(b) On or about May 29, 1964, Respondent by its officer and agent Frank Martino, orally warned its employees at the Denton plant that if the Union were selected by its employees as their collective bargaining representative that Respondent would layoff employees.

(c) On or about May 29, 1964, Respondent by its supervisor and agent, Opal Madewell, orally interrogated its employees at its Denton plant concerning their union membership, activities and desires and the union membership, activities and desires of other of its employees."

This consolidated Case, Number 16–CA–2116–2138, was set for hearing on Monday, February 8, 1965.

On the night of Thursday, February 4, the General Counsel sent a telegram to counsel for petitioner, first seen by him on February 5, giving notice that a motion would be filed seeking to amend the complaint by adding two further allegations of violations of § 8(a) (1).

The essence of the new charges was:

(1) on or about January 28, 1965, [one week before the telegram was sent] the company granted its employees at its Pilot Point plant a general wage increase and other benefits or improvements and terms and conditions of employment if they refrained from becoming or remaining members of the union or giving any assistance or support to it, or in order to induce them to do so;

(2) on or about February 1, 1965, [three days before the telegram was sent] the company threatened to sell its Denton plant because its employees had selected the union as their collective bargaining representative and in order to discourage its employees from becoming or remaining members of the Union or giving any assistance or support to it.

On January 26, 1965, the Denton employees had balloted and had chosen to be represented by the Union. No demand had been made for union representation or an election at the Pilot Point plant, but the company was well aware of the efforts to organize its employees, going back to May, 1964. The five cent an hour wage increase to the Pilot Point plant employees was announced on January 28, two days after the election in Denton. The first of three "for sale" signs appeared on the Denton plant on January 31, five days after the election.

Reverting to the complaint of October 30, 1964, the Trial Examiner found for the company as to original paragraphs (a) and (c) and the Board affirmed. The Trial Examiner also found for the company as to paragraph (b), which charged that the address of Martino on May 29, 1964, was an oral warning to the Denton employees that if the Union were selected as their collective bargaining representative the company would lay off employees.

■ By a two to one vote, the Board reversed the Trial Examiner on this point, the majority saying that in the context of an organizational campaign, preceding a representation election, certain portions of the speech constituted a threat that if the employees selected a union the company would discontinue its make-work policies in slow seasons and would not manufacture goods until orders were received. We set out a full and complete copy of Martino's speech as an appendix to this opinion and we agree with the Trial Examiner that "since no part [of the speech] violates the right of free speech, it would be difficult to find that the sum of all its parts constitutes threats or promises to the employees, or is coercive respecting their rights to support or not support the Union".

We think the Trial Examiner and the dissenting Board Member were right in holding that when one views the speech as a whole no violation is seen. We cannot see that the speech was a threat or a warning or reasonably subject to such an interpretation. The speech argues from the standpoint of what has allegedly occurred in *other plants in the past*. At no place did Martino propose to say what the company would do in the future.

 We next consider what should have been done with reference to the new charges as to the wage increase at Pilot Point and the posting of the "for sale" signs at Denton.

We note that counsel for the petitioner had only two full days notice of these new charges and that these days were a Saturday and a Sunday. We further note that the amended complaint, bringing these additional charges, was not filed until the day of the hearing. What counsel did about this development may best be described in the words of the Trial Examiner, appearing in the Record as follows:

"Counsel for Respondent objected strenuously to proceeding to hearing on the allegations of the amended complaint, respecting the wage increase and the placing of "For Sale" signs on the building at the Denton plant. The ground for his motion for continuance, as the hearing opened, was that Respondent had been denied due process in being called upon to defend allegations with scarcely any notice, or time to prepare its defense. After full consultation between the Trial Examiner and all counsel, the motion for postponement was denied. As a result however of the discussion it was agreed that Respondent should submit as an 'Offer of Proof' the evidence it would introduce on these two issues if, as counsel contended, time had permitted proper preparation of the defense. The record was held open for this purpose only.

"Pursuant to such understanding, and after the hearing closed, Respondent submitted to the parties and to the Trial Examiner a comprehensive offer, culminating a motion to reopen the hearing to enable Respondent to introduce the evidence set forth in the offer of proof. The opposition of both counsel for the General Counsel and the Charging Party were also received and, together with the offer of proof, were duly considered. The offer of proof and motion to reopen the hearing were, by separate order, denied, and the offer and the papers in opposition were made part of the record as Trial Examiner's exhibits. While Respondent reasserts in the brief that it is a denial of due process to refuse to grant the motion for continuance on the issues raised by the amended charge and complaint, and to reject the offer of proof and to refuse to reopen the hearing as to such issues, Respondent suffers no prejudice from such rulings, even if erroneous, in view of the recommended dismissal of the complaint in its entirety; and *in the main* [emphasis added], the proffered evidence was cumulative to that admitted."

Indeed, there would have been no prejudice to the petitioner if the dismissal recommended by the Trial Examiner had taken place, but this is not what happened. The Board, contrary to the Trial Examiner, found that the record as a whole supported the allegations as to the wage increase and the posting of the "for sale" signs. In a footnote to its decision and order, the Board stated, "Assuming the truth of the facts alleged in the offer of proof, the evidence which Respondent offers is merely cumulative and in no way would alter the result reached herein. Moreover, the information in support of Respondent's assertions were substantially contained in Respondent's own records or within its own knowledge and required no extensive investigation. Therefore, no prejudice could have occurred from the denial of a delay. Accordingly, we shall deny Respondent's motion to reopen the hearing".

We cannot approve of this action of the Board. It necessitates denial of enforce-

ment of its Order as of this time. The governing principles are to be found in Morgan v. United States (1938) 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129. This was a case involving an order of the Secretary of Agriculture fixing the maximum rates to be charged by commission men at stockyards. The order was held void for failure to allow the full hearing required by the applicable statute.

The Court held that in administrative proceedings of a quasijudicial character the liberty and property of citizens must be protected by fair and open hearing, that such a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party, and to meet those claims.

Due process in an administrative hearing includes a fair trial, conducted in accordance with fundamental principles of fair play and applicable procedural standards established by law. Administrative convenience or necessity cannot override this requirement, Swift and Co. v. United States, 7 Cir., 1962, 308 F.2d 849; Hornsby v. Allen, 5 Cir., 1964, 326 F.2d 605.

The refusal of the Trial Examiner to receive and consider competent and material evidence which could have been offered after a reasonable opportunity to meet the charges amounts to denial of due process, and the fact that the Board had reached, or might have reached, no different conclusion had the rejected evidence been received is entirely beside the point, N. L. R. B. v. Burns, 8 Cir., 1953, 207 F.2d 434.

The Respondent was given two days notice, a Saturday and a Sunday, ordinarily non-working days. The charges were entirely new. They had to be because the asserted facts had arisen only a few days previously. This was not some addition to or refinement of the charges which had been pending since October 30. Totally new and different factual charges were introduced, and that not until the day of the hearing itself. Counsel for Respondent was given one

week in which to prepare and present an offer of proof.

Section 102.15 of the Board's Rules and Regulations provide that when the Regional Director issues a formal complaint he shall cause it to be served on all other parties, stating the unfair labor practices, and containing a notice of hearing before a trial examiner at a place therein fixed and at a time *not less than ten days after the service of the complaint*. Section 102.17 of the Board's Rules and Regulations provides that a complaint may be amended upon such terms as may be deemed just. The charges filed on February 5, 1965, were far beyond the scope of an ordinary amendment. They were brand new matters, grounded on facts occurring not more than a week prior to the telegraphic notice. These new charges cannot be deemed mere amendments within the meaning of § 102.17. Two days notice cannot be "deemed just", for § 102.15 requires that the hearing shall be held not less than ten days after the service of a complaint in which the unfair labor practices must be stated.

The Board suggests that the procedure here invoked may be approved under the authority of N. L. R. B. v. Air Control Products of St. Petersburg, Inc., 335 F. 2d 245, 5 Cir., 1964. The rationale of that case is simply that a hearing is unnecessary if there is nothing to hear. In that case, however, the Court said, "Of course it is clear that § 8(a) (5) orders which rest on crucial factual determinations made after ex parte investigations and without hearing cannot stand." In the instant case, the company vigorously disputed the allegations of the new complaints, contending that the wage increase simply followed a well established pattern in that regard and was initiated at a time when there was no demand for union representation. It further contended that the offer to sell the building in Denton was not an offer to sell the business and was, in fact, made by an independent corporation, the owner of the building. We make no intimation as to the merits of these contentions,

but we do hold that there was something entitled to be heard. We are of the view that the requirements of due process are not satisfied by putting the Respondent to a hearing on the same day the charges are formally filed. Allowing a respondent one week in which to come up with an offer of proof cannot substitute for the hearing, after at least ten days notice, as provided by the Board rules.

Since the Board made a decision and entered an order pursuant to a proceeding which denied the Respondent the due process to which it was entitled, we might very well close the books by simply denying enforcement. The better procedure, we feel, is to deny enforcement as the situation now stands and to remand the case to the Board for a further hearing to be conducted consistently with the views herein expressed.

Without prejudice to a further hearing to be conducted in keeping with the requirements of due process,

Enforcement denied and remanded to the Board.

## APPENDIX
### Speech of Vice-President Martino
### May 29, 1964

"I feel a little bit strange up here this afternoon because it will be the first time in my life that I have ever talked with you and had exactly what I was going to say written in front of me and a little black machine here to record exactly everything that I say, and I am doing this to prevent either myself or the company from being sued.

"This month I received a telegram saying That Joyce Billingsley, Cynthia Landers, Naomi Erwin, Stella Rice, Mary George, Patsy Patterson, Jane Yeatts, Joan Stubblefield, Myrtie Armstrong and Carol Senkel were a part of the organizational committee to secure a union here at Russell-Newman. Needless to say, we met this on the eve of our 25th Anniversary with some great surprise. We still have the same objections as we have had on the previous five times that the union has attempted to organize you for your dues. For some of you new

ladies who have not been here to defeat elections of the past, we would like to reiterate to you our belief.

"1. With a union you surrender your rights to discuss your problems with us. In fact, you hire a disinterested party from out of town to tell us about your problems. Let's reverse this. If I had a problem that concerned you, what would your reaction be to my going out of town, hiring a stranger you didn't know to approach you about our mutual problem.

"2. Outside influence cannot obtain more than the company in the past has willingly done.

"3. A union would create a division of employees here. The same leaders, the same feelings, the same instances that exist in a campaign exist once a union is voted in. Texas has Right-to-Work Law and no one can be forced to join the union as a provision of working. No one can lose their job because they have not joined the union or have not signed a pledge card. Don't let anyone tell you differently.

"4. A union will reduce your actual true earnings through their monthly dues and other charges. I even notice that they offer you the opportunity for you to pay for a physical examination by them instead of your own doctor via a mobile truck that by their admission does not even exist in the Southwest.

"5. We have never felt that Russell-Newman or Denton, Texas was the size or place for outsiders to take away your rights. This is both a personable town and company. All of you know Mr. Newman, Mr. Robinson, myself or Bill Harvey. In the company and community you are a real person with a name and not just a social security number.

"6. I wonder just what it is in it for those who are a part of the organizational committee.

"Now, in the past what has the company done:

"1. It has given all of us jobs and paid us regularly. As you will remember when we had to tear out the entire sec-

ond floor, the company got crew to work seven days a week, twenty-four hours a day, and paid you while you were off. Not only this, but Mr. Newman has always said he would prefer to hire too few and work overtime than to hire too many and risk the possibility of someone not having a full paycheck some week. Do you honestly think a union could make Mr. Newman do this if he didn't want to.

"2. You have grown as the company has grown. Pay scale, benefits, working conditions have increased as we have grown together. Mr. Newman's policy has always been to make the conditions the best the company can afford when it can afford them. This he has always done because he wanted to.

"3. The company has provided a safe and a desirable place to work in a community that is excellent to raise our family. We have even moved people from machine to machine and unit to unit to keep everyone in work. It is this mutual interest that we have had for you that makes us different from the place that would send you home when either you or your unit ran out of work.

"4. Continuous work all year and at many times at great expense to the company. We have just been through one of these periods when you were making a lot of tailored pajamas in some odd ball colors that you probably hadn't seen in years and years and some 15 denier sets. They were cut so that you would have something to do. As I understand, union plants generally shut down as soon as the work runs out.

"5. We have built a strong company where one does not worry about a paycheck being cashed. This is in light of the fact that we operate differently from most lingerie manufacturers. Before we ever receive an order from an independent customer, we buy hundreds of thousands of dollars of piece goods and trims so that we can keep you working. This is all done before the customer sees a sample. Would you risk this if there was an uncertain relationship between you and I.

"6. We have attempted to be fair to all even to those who many times in the past have wanted to relinquish their right to others.

"Now, for the record, what can the union do and what can it not do. There are three things a union can do: 1. It can charge you dues. As I understand the regular monthly dues are $4.00 a month is what is presently being charged. 2. They can call you out on strike. In either case it cost you money. The union didn't pay those who went on strike for three years at a garment company some thirty miles from here. Who lost? 3. They can talk to the company about your problems but you can do that yourself now and it doesn't cost you $4.00 a month. Now, some of the things that the union cannot do. It cannot pay the employee's wages or benefits, only the company can do this. Take hospitalization for an example, one of the nation's leading companies would not even quote on a plan similar to yours. They had nothing available with this much coverage at this cost to you. Their plan would cost you $24.00 a year more and with maternity and family benefits would be an additional $70.00 more or a total increase of $94.00 per year. Will the union pay this? 2. The union cannot promise or assure you of anything. They only negotiate for you. Your job and my job depends, incidentally, on how well your company negotiates. Every item you make, your company has bargained with someone on selling. A company can not stay in business and give away more than it earns.

"In closing, I would like to remind you that you do not have to vote for the union just because you have signed a card. The card places you under no obligation to the union nor can they require you to pay dues because you signed the card. Texas has a Right-to-Work Law which means you do not have to belong to the union or pay dues just because someone else does. Recently some of you were told that a majority of the employees of Russell-Newman had signed cards asking for a vote. If this is true, it seems

strange that they would not have filed for a petition with the federal government for a vote since this is the only requirement. Could it be that a majority of the employees of Russell-Newman have not signed and you are being told this in an effort to get enough signatures.

"I hope, on this year, our 25th Anniversary, that we can continue the same loyal interest for one another through the next 25 years as we have had in these years past. Don, is there anything you would like to add—Thank you a lot."

## ON PETITION FOR REHEARING

### PER CURIAM:

In response to fears expressed in the Petition for Rehearing filed on behalf of Russell-Newman, it is now made positively clear that upon remand the Petitioner will most certainly be free to urge to the Board, or to any reviewing Court, the jurisdictional contentions now asserted. In fact, we are at loss to understand how Petitioner could have thought such to have been foreclosed by any of the language appearing in the original opinion. We think the reasoning and results of the decision are perfectly obvious. Petitioner complained of being put to a hearing on certain allegations of which it had received only the shortest notice. It is now to receive a further hearing. If an effort is made to conduct a hearing on any issue over which the Board has not acquired jurisdiction, then it is up to the Petitioner to raise the point and preserve its record.

Petitioner further suggests that the opinion did not always properly use the word "charge" in its specific statutory sense. There are instances in which we more than once used the word in its normal, ordinary meaning, synonymously to allegation, rather than in a strictly statutory sense. Viewed in context, we do not see how this can be misleading and we decline to enter further into any additional semantics.

The Petition for Rehearing is
Denied.