NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BATA SHOE COMPANY, Inc.,
Respondent.

United Shoe Workers of America,
AFL–CIO, Intervenor.

No. 10552.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 11, 1967.

Decided April 6, 1967.

J. Spencer Bell, Circuit Judge, dissented.

Elliott Moore, Atty., N.L.R.B., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Marsha E. Swiss, Atty., N.L.R.B., on brief) for petitioner.

Frederick T. Gray, Richmond, Va., (John O. Peters, Richmond, Va., Madeline Balk, New York City, Elbert H. Coles, Christopher J. Hoey, New York City, Williams, Mullen & Christian, Richmond, Va., and Seligman & Seligman, New York City, on brief) for respondent.

Joseph L. Rauh, Jr., and John Silard, Washington, D. C., on brief for intervenor.

Before BRYAN, BELL and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order that Bata Shoe Company enter into collective bargaining with the United Shoe Workers of America, AFL–CIO (hereinafter the Union). Following a consent election [1] on April 23, 1965, the Union was certified as exclusive representative for production and maintenance employees at the Company's Belcamp, Maryland, plants. The Company's refusal to bargain with the Union enables judicial review of the certification incident to the Section 8(a) (5) unfair labor practice proceeding.[2]

The Company has challenged on a plethora of grounds the election and certification of the Union.[3] The Company asserts generally that the integrity of the election was impaired by misrepresentations in Union campaign literature, coercive activity on the part of Union adherents, and confusion accompanying the conduct of the election which prevented eligible employees from exercising their franchise and improperly permitted others to vote.

The results of the election show that 1,082 ballots were cast for and 1,036 ballots against the Union, six ballots were voided, and forty-one challenged. There were approximately 2,583 potential participants. No resolution of the challenges was made since they were not sufficient in number to affect the results of the election.

The Company filed with the Regional Director for the Labor Board timely objections to the election in accord with Board rules.[4] Following prescribed procedure in stipulated consent elections,[5] the Regional Director made an *ex parte* investigation of the objections and issued a written report in which he recommended that the Company's objections be overruled in their entirety and that the Union be certified. After consideration of the Regional Director's report and the Company's written exceptions— but without ordering a hearing—the Labor Board rendered a decision in which it adopted the Regional Director's recommendations for the reasons set forth in his report and certified the Union as exclusive bargaining representative of the Company unit. The Labor Board, in deciding the election questions on the written record necessarily, under its own rules, determined at this juncture that the Company's exceptions did "not raise substantial and material issues with respect to the conduct or results of the election * * *." [6]

Notwithstanding certification the Company continued its refusal to recog-

1. The election was conducted pursuant to a "Stipulation for Certification upon Consent Election" entered into by the Company and Union.

2. The Labor Board's decision in the unfair labor practice case is reported at 61 L.R. R.M. 1364 (February 24, 1966).

3. In the conclusion to its "Exceptions to Regional Director's Report on Objections" to the representation election, the Company sets out twenty-three incidents which it maintains individually necessitate setting aside the election and cumulatively "clearly compel" this action.

4. NLRB Rules & Regs. § 102.69(a), 29 C.F.R. § 102.69(a).

5. NLRB Rules & Regs. § 102.69(c), 29 C.F.R. § 102.69(c).

6. Section 102.69(e) of the NLRB Rules and Regulations provides that in cases involving consent elections pursuant to Section 102.62(b) (Stipulation for Certification Upon Consent Election)
"if exceptions are filed, either to the report on challenged ballots or objections, or both if it be a consolidated report, and *it appears to the Board that such exceptions do not raise substantial and material issues with respect to the conduct or results of the election, the Board may decide the matter forthwith upon the record*, or may make other disposition of the case.

nize and bargain with the Union and a Section 8(a) (5) unfair labor practice complaint was issued.[7] In its answer to the complaint the Company alleged, in addition to misconduct in connection with the election, that it had been denied a hearing on substantial and material issues of fact and law raised by its objections to conduct affecting the results of the election and its exceptions to the Regional Director's report.

Two days before the unfair labor practice hearing the Company filed with the Labor Board a motion to rescind the certification, to reconsider and permit the Company to be heard in the representation case, and to postpone the unfair labor practice hearing until final determination of the issues in the representation case. The Board by telegraphic order denied the motion "with leave to the Employer to request the Trial Examiner to permit the issues raised in the Employers Objections and Exceptions filed in [the representation case] * * * to be heard * * *" in the unfair labor practice proceeding. The Board found "[t]he Employers contention that litigation of such issues in a complaint proceeding would substantially prejudice his rights * * * without merit."

The 8(a) (5) hearing commenced with a discussion of the Labor Board's instructions in which the Trial Examiner conceded that he had not resolved the question of the extent of his responsibility in the representation matter and suggested that this be argued to him by the parties along with the other issues in the proceeding. The essence of the Trial Examiner's position was, as stated to the parties at the hearing, that the Company

"should seek to do whatever it is you think ought to be done in either the complaint case or the misrepresentation case. * * * And I would assume since you seek to have this certification set aside in effect, if not in fact in this proceeding by interposing your affirmative defenses that you wish to raise in this proceeding anything that you might have legitimately raised in the representation proceeding."

At the invitation of the Trial Examiner, counsel for the Company outlined the various objections which had been set forth in its answer to the complaint, and then reviewed in some detail the nature of the evidence the Company was prepared to offer of alleged irregularities in the conduct of the representation election. Although the Trial Examiner subsequently reiterated that he would receive all evidence advanced by the Company in support of its objections to the election, the Company offered the oral testimony of but a single witness on a minor matter.[8] The Company explains its failure to come forward with additional evidence at the hearing on the ground that the Trial Examiner had no authority to act with respect to the certification in the case and, therefore, presentation of additional evidence would have been futile.

The Trial Examiner's decision, which was adopted by the Labor Board in its

---

If it appears to the Board that such exceptions raise substantial and material factual issues, the Board may direct the regional director or other agent of the Board to issue and cause to be served on the parties a notice of hearing on said exceptions before a hearing officer. * * * Upon the close of the hearing the agent conducting the hearing, if directed by the Board, shall prepare and cause to be served on the parties a report resolving questions of credibility and containing findings of fact and recommendations to the Board

as to the disposition of the challenges or objections or both if it be a consolidated report." 29 C.F.R. § 102.69(e). (Emphasis added.)

7. Section 8(a) (5) of the National Labor Relations Act provides that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with representatives of his employees * * *." 29 U.S.C.A. § 158(a) (5).

8. Whether some documentary evidence was offered is considered infra at page 830.

order to bargain, resolves the question of his authority in the unfair labor practice proceeding. The Trial Examiner states in his decision that

> "[i]n my view, the initial question before me was whether Respondent [Company] has offered me sufficient evidence to cause me to conclude that the Regional Director and the Board acted on erroneous or incomplete material findings, and the question of the merit of the objections is before me only to the extent that the evidence offered by Respondent [Company] requires reconsideration of the findings and conclusions in the representation case."

The Trial Examiner goes on to conclude in his decision that apart from one minor matter, the Company

> "adduced no evidence to controvert or supplement the findings of the Regional Director with respect to [its] * * * objections to the conduct of the election, and, absent such evidence, I consider myself bound by the conclusions previously reached by the Regional Director and affirmed by the Board in certifying the Union as representative of Respondent's employees."

### I.

We are presented with a procedural question of controlling importance. Was the Company entitled to a post-election hearing on its objections to the election and if so entitled was it afforded a sufficient hearing in the Section 8(a) (5) proceeding? [9]

■■■ Due process of law demands and the present Rules and Regulations of the Labor Board provide that where there is a substantial and material issue of fact relating to the validity of a representation election that a hearing be conducted *at some stage* of the administrative proceeding before the objecting party's rights can be affected by an enforcement order. United States Rubber Co. v. NLRB, 373 F.2d 602 (5th Cir. 1967); NLRB v. Lamar Elec. Membership Corp., 362 F.2d 505 (5th Cir. 1966); NLRB v. Capital Bakers, Inc., 351 F.2d 45 (3d Cir. 1965); International Ladies' Garment Workers' Union v. NLRB, 339 F.2d 116 (2d Cir. 1964); NLRB v. Ideal Laundry & Dry Cleaning Co., 330 F.2d 712 (10th Cir. 1964); NLRB v. Joclin Mfg. Co., 314 F.2d 627 (2d Cir. 1963); NLRB v. The Lord Baltimore Press, 300 F.2d 671 (4th Cir. 1962); NLRB v. Poinsett Lumber Mfg. Co., 221 F.2d 121 (4th Cir. 1955); NLRB v. West Texas Utilities Co., 214 F.2d 732 (5th Cir. 1954); NLRB Rules & Regs. § 102.69, 29 C.F.R. § 102.69. To borrow the words of Judge Brown, writing for the Fifth Circuit, "it is clear that § 8(a) (5) orders which rest on crucial factual determinations made after *ex parte* investigations and without a hearing cannot stand." NLRB v. Air Control Prods. of St. Petersburg, Inc., 335 F.2d 245, 249 (5th Cir. 1954).

---

9. The present case involves an election pursuant to a "Stipulation for Certification Upon Consent Election." See NLRB Rules & Regs. § 102.62(b), 29 C.F.R. § 102.62(b). This is to be distinguished from an election pursuant to an "Agreement for Consent Election" in which the parties agree that objections and challenges are to be resolved by the Regional Director whose rulings "shall be final." See NLRB Rules & Regs. § 102.62(a), 29 C.F.R. § 102.62(a). We need not in the present case decide whether a post-election hearing may be required following the latter type of consent election. In such cases the Fifth Circuit has held that due process requires a hearing. NLRB v. Sidran, 181 F.2d 671 (5th Cir. 1950). Contra, e.g., Elm City Broadcasting Corp. v. NLRB, 228 F.2d 483 (2d Cir. 1955); NLRB v. Standard Transformer Co., 202 F.2d 846 (6th Cir. 1953). But see NLRB v. Parkhurst Mfg. Co., 317 F.2d 513 (8th Cir. 1963), distinguishing *Sidran*. The "Agreement for Consent Election" currently in use by the Labor Board provides the "method of investigation of objections and challenges, *including the question of whether a hearing should be held in connection therewith*, shall be determined by the Regional Director whose decision shall be final." (Emphasis added.)

■■ Conversely, there is no requirement, constitutional or otherwise, that there be a hearing in the absence of substantial and material issues crucial to determination of whether NLRB election results are to be accepted for purposes of certification. See NLRB v. Sun Drug Co., 359 F.2d 408 (3d Cir. 1966); NLRB v. Nat'l Survey Serv., Inc., 361 F.2d 199 (7th Cir. 1966); NLRB v. Air Control Prods. of St. Petersburg, Inc., 335 F.2d 245 (5th Cir. 1964); NLRB v. J. J. Collins' Sons, Inc., 332 F.2d 523 (7th Cir. 1964); NLRB v. Clearfield Cheese Co., 322 F.2d 89 (3d Cir. 1963); NLRB v. O.K. Van Storage, Inc., 297 F.2d 74 (5th Cir. 1961); see generally 1 Davis, Administrative Law §§ 7.01–.07 (1958). A hearing is unnecessary, therefore, where if all the facts contended for by the objecting party "were credited no ground is shown which would warrant setting aside the election." NLRB v. Air Control Prods. of St. Petersburg, Inc., supra, 335 F.2d at 249; accord, NLRB v. Sun Drug Co., supra, 359 F.2d at 414; NLRB v. Wilkening Mfg. Co., 207 F.2d 98, 100 (3d Cir. 1953).

■■ It is settled that the burden is on the party objecting to the conduct of a representation election to prove that there has been prejudice to the fairness of the election. NLRB v. Mattison Mach. Works, 365 U.S. 123, 81 S.Ct. 434, 5 L.Ed.2d 455 (1961). And in order to be entitled to a hearing on its objections to an election the objecting party must make a proffer of evidence "which *prima facie* would warrant setting aside the election." NLRB v. O.K. Van Storage, Inc., supra, 297 F.2d at 75; see United States Rubber Co. v. NLRB, supra. The determination, however, of whether substantial and material factual issues have been raised so as to necessitate a hearing is a question of law and ultimately a question for the courts. See United States Rubber Co. v. NLRB, supra; NLRB v. Sun Drug Co., supra; NLRB v. Ideal Laundry & Dry

Cleaning Co., supra; NLRB v. Joclin Mfg. Co., supra; NLRB v. Poinsett Lumber Mfg. Co., supra.

■ For reasons which are apparent from our subsequent discussion in this opinion,[10] we believe the Company's objections to the election and exceptions to the report of the Regional Director raised material and substantial factual issues which entitled it to a hearing. But we also are of the opinion that a sufficient hearing was accorded the Company in the Section 8(a) (5) proceeding. That the Company chose not to present more evidence than it did in support of its previous contentions does not entitle it to another opportunity. The Trial Examiner, as noted above, expressed his willingness to receive all evidence offered and to reconsider the *ex parte* findings if the new evidence indicated them to be incomplete or erroneous.

This court is in accord with other circuits in rejecting the Company's contention that it is entitled to *separately* litigate the representation issues. Adjudication of such issues in the 8(a) (5) proceedings does not, we think, substantially prejudice the company's rights. In NLRB v. Poinsett Lumber & Mfg. Co. this court stated that where the objecting party raising material and substantial factual issues does not have an opportunity to be heard before the 8(a) (5) hearing it "was entitled to present its evidence at the unfair labor practice hearing before the Trial Examiner * * *." Supra, 221 F.2d at 123; accord, e. g., NLRB v. Capital Bakers, Inc., supra; NLRB v. Ideal Laundry & Dry Cleaning Co., supra; NLRB v. The Lord Baltimore Press, supra; see Inland Empire Dist. Council, Lumber & Sawmill Workers Union, Lewiston, Idaho v. Millis, 325 U.S. 697, 65 S.Ct. 1316, 89 L.Ed. 1877 (1945). So long as the objecting party (and his election adversaries) is given the opportunity to be heard, to call and cross-examine those who are the source of Board evidence,

10. See, e.g., discussion, infra, at page 830.

and to present pertinent evidence of its own the hearing is fundamentally fair and satisfies the requirements of due process.

The intervenor Union argues to this court, as it urged upon the Trial Examiner, that the 8(a) (5) proceeding was a hearing to receive and consider evidence *de novo*. We do not agree, but think with the Labor Board that in hearing on objections to the conduct of representation elections the findings of the Regional Director, here embodied in his "Report on Objections," will be *prima facie* "sufficient against which to consider the evidence adduced at the hearing and need not be reproved [sic] in what might otherwise become protracted hearings." To hold otherwise would invite protracted delay in the certification process.[11]

## II.

We now turn to a consideration of the facts of record, which include those developed at the unfair labor practice proceeding and in the Regional Director's "Report on Objections" to the election,[12] to determine whether the Labor Board's certification of the Union and consequent finding of an 8(a) (5) violation were based on facts supported by substantial evidence and on the application of correct legal standards. We think not and deny enforcement.

We approach the merits of this case fully cognizant that Congress has entrusted the Labor Board "with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L. Ed. 322 (1946); accord, NLRB v. Watermann S. S. Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704 (1940). However, as has been said by the Seventh Circuit,

"There is no conflict or contradiction between the substantial evidence rule determinative of the scope of review and the principle whereunder the Board is entrusted with wide discretion in establishing the procedures and safeguards necessary to insure the fair and free choice of bargaining representatives as enunciated in National Labor Relations Board v. A. J. Tower Co., 1946, 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322. These rules do not conflict because they affect differing spheres of activity. The Board's wide discretion lies in the initial promulgation of rules and regulations, while the court exercises its duties in reviewing decisions involving application of the Board's rules. Judicial review in these cases is not concerned with the wisdom of the Board's pol-

11. "[I]t is implicit in the [Labor] Act that questions preliminary to the establishment of the bargaining relationship be expeditiously resolved * * *." NLRB v. O.K. Van Storage, Inc., supra, 297 F. 2d at 76. The importance of expeditiously dealing with questions in the certification process is compounded by the sheer number of representation elections conducted by the Board. The Board conducted 7,974 such elections during the 1966 calendar year. Experience shows that objections are filed in approximately nine percent of the elections and some seventeen percent of those in which objections are filed are set aside by the Board. In over thirty percent of the rerun elections, the results differ from those in the original election. See Pollitt, NLRB Re-Run Elections: A Study, 41 N.C.L.Rev. 209 (1963).

12. Congress has provided in Section 9(d) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 159(d):

"(d) Whenever an order of the Board made pursuant to section 10(c) is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) [providing for representation elections and certification] of this section and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under section 10(e) or 10 (f), and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript."

icy but must determine whether the record as a whole supports the findings and conclusions respecting compliance with the policies, rules, and regulations promulgated by the Board. Celanese Corp. v. NLRB, 291 F.2d 224 (7th Cir. 1961)

The Company's principal objections to the conduct of the election may be divided broadly between those relating to campaign literature and those involving procedural irregularities. The Company argues first that the election should be set aside because of material misrepresentations in Union literature during the pre-election period which prevented employees from making a "free choice." See General Shoe Corp., 77 N.L.R.B. 124, 126–27 (1948).

The Company points to Union materials concerning the role of the Government on the Union's behalf which were distributed on February 3, March 10, April 22, and April 23, the day of the election. Typical of the statements made is the following distributed on April 22:

> "Some of the workers have asked if they will lose any benefits they now have if they vote for the union! The answer is NO! Our Government protects the workers' benefits that are now in effect. Your Union will negotiate to add to these benefits!" [13]

The Regional Director's Report on Objections, the recommendations and reasoning in which were adopted by the Labor Board, found these were "material misrepresentations and not merely artless statements of the function of the * * *" Labor Board. Notwithstanding this specific finding, mitigating conditions were thought sufficient to reject this challenge to the fairness of the election. The mitigating circumstances enumerated were the experience of the Company employees who had been through a number of NLRB elections, including one in December 1963; the Company's letter to its employees of February 4, 1965 asserting that the Union was trying to "mislead" employees into believing it is somehow tied into the United States Government and noting that this is "untrue" and that the Government "specifically rejected all the Union's claims in the last election;" the further opportunity for a Company reply to the Union's letter of March 10; and the fact that the pertinent statements in Union literature distributed on April 22 and 23 raised no new issues in addition to those which the Company responded to on February 4 or could have responded to subsequently had it elected to do so.

The Company also singles out a Union leaflet distributed on April 20, two days before the election. The leaflet, which is entitled "How Bata Cheats You" and closes with "Vote Yes Stop the Cheating," compares what is described as the "Bata" and "Union contract" ways of computing compensation for piece rate workers and asks whether any Bata worker knows how overtime is figured by the Company on Saturdays. The Company maintains that this literature contained material misrepresentations which mislead the employees. But the

---

13. Other statements included:
Union members know benefits "achieved * * * through their union * * * cannot be chiseled away or forgotten, because they are spelled out in union contracts which have the backing of the U. S. Government and the strongest shoe workers union in the country. * * * [W]e suggest you sign and mail yours [authorization card] immediately. THE SOONER YOU DO—THE SOONER USWA AND UNCLE SAM CAN GO TO WORK FOR YOU." (February 3).

Benefits gained by union members "are more than company whims and promises. They are real because they are contained in union contracts which have been signed by the company and the union with the backing of the U. S. Government." (March 10).
"They know the difference between promises and a union contract. They know—as Bata workers know—that Company promises made before an election mean nothing unless they are contained in a union contract and guaranteed by the Government of the United States." (April 23).

Regional Director found that the Company had adequate opportunity in which to respond to any misrepresentation and in addition possessed the most comprehensive knowledge of the facts presented as "Bata's Way". The Company, however, failed to discuss this leaflet in its newspaper published on April 22 and devoted entirely to anti-Union propaganda. Moreover, the Regional Director found that "because most of the employer's production employees are piece workers, the employees themselves would be in an excellent position to evaluate the truth or falsity of "Bata's Way". The Regional Director also concluded that on the facts before him the statements regarding the Union's way were not misrepresentations.

The Company labels untrue and inflammatory a charge first made in a Union leaflet of April 8 that the Company was flooding the plant with Japanese insoles. The charge was repeated in Union literature issued April 14 and 20, and was mentioned in a community newspaper article on April 22. The Regional Director reasoned, however, without considering whether the Union's allegation was true, that the Company "could and in fact did refute this charge on April 9 and 14, 1965." The Company newspaper on April 9 characterized the Union's charges on April 8 as "deliberate lies," assured Company employees that the only Japanese insoles imported by Bata were for testing purposes in 1963, and announced that Company officers would contribute $1,000.00 to the Blood Bank of Maryland if the Union could support its claim. A letter from the Company president to employees on April 14 called their attention to the fact that the Union had failed to support its charge and, therefore, should itself pay the $1,000.00 to the Blood Bank.

■ We do not quarrel with the conclusions of the Regional Director or Labor Board in respect to their treatment of the literature discussed above. We believe the Board has applied correctly the applicable principles. The true rule is not "that when false statements are made they constitute an interference with free choice, but that *when* false statements are made which constitute an interference with free choice, for or against a bargaining representative, an election should be set aside." Anchor Mfg. Co. v. NLRB, 300 F.2d 301, 303 (5th Cir. 1962). Misconduct must be shown to have prejudiced the fairness of the election. See NLRB v. Mattison Mach. Works, supra.

■ The policies of the Labor Board are well suited to implement this principle. Election results are not to be disturbed when challenged because of misrepresentations in campaign propaganda unless "(1) there has been a material misrepresentation of fact, (2) this misrepresentation comes from a party who had special knowledge or was in an authoritative position to know the true facts, and (3) no other party had sufficient opportunity to correct the misrepresentations before the election." Celanese Corp. v. NLRB, 291 F.2d 224, 226 (7th Cir. 1961); see NLRB v. Bonnie Enterprises, Inc., 341 F.2d 712, 714 (4th Cir. 1965); Annot., 3 A.L.R.3d 889 (1965); cf. Linn v. United Plant Guard Workers, 383 U.S. 53, 60, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); see generally Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 82–92 (1964); Fuchs, Pre-election Campaign Propaganda & Activities Before the National Labor Relations Board, 4 B.C.Ind. & Com.L. Rev. 485 (1963).

The Company's challenge to the content of a leaflet distributed by the Union on the eve of the election, April 22, presents the most important attack on the integrity of the proceeding. This leaflet was addressed to Mr. Dolezal, Company president, and stated in part:

"In *your New York union contracts* which your attorneys Seligman and Seligman participated for some of the shoe companies, the following benefits are in effect:

"* * * ["Union benefits" and "Bata" health, pension and wage

benefits are contrasted in a columnar presentation]

"THEREFORE, MR. DOLEZAL, SINCE YOUR HIGH PRICED ATTORNEYS, SELIGMAN AND SELIGMAN, HAVE THESE NEW YORK UNION AGREEMENTS, WHY NOT BE FAIR AND SHOW THEM TO BATA EMPLOYEES?" (Italics added.)

The Company urges before this court that the "benefits" listed in this leaflet were in large part misrepresentations of fact. We agree with the Board that to the extent this Company objection relates to the benefits set out as those of the Bata employee it is not persuasive. Company employees may be presumed in this instance to have sufficient knowledge of their own work conditions so as not to be materially misled.

However, we are unable to agree with the Board that the list of benefits "[i]n your New York contracts which your attorneys Seligman and Seligman participated for some of the shoe companies * * *" did not constitute a material misrepresentation. We believe this is so even assuming arguendo, as the Board concluded, that the reference is not to Bata-Union contracts but labor agreements of other companies with the Union in New York. The Board itself specifically found that *at least* one pertinent

contract placed in evidence by the Company "did not reflect all the benefits claimed by the * * *" Union in its leaflet.

The most important "Union" health benefit listed was *Clinic*—For all union members and dependents: Includes free diagnosis—free doctor—free drugs— free X-ray, etc." The Board ignored that free medical benefits of dependents in New York did not extend generally to clinical services. The Board knew, or should have known, that this representation was substantially incorrect because the Company offered in evidence at the 8(a) (5) proceeding a major agreement providing limited clinical benefits for dependents of employees in New York locals.[14] The same agreement was furnished the Regional Director by both the Company and the Union.[15]

In our opinion any misrepresentation of fact in respect to medical benefits in the New York contracts would be material—for this is a matter of vital concern to the ordinary worker. Especially is this so if as claimed in an adjacent column in the same leaflet the Company then "had no such clinic * * *." Moreover, because the present leaflet was distributed on the eve of the election, there was insufficient time for the Company to make an effective reply.[16]

14. The transcript of the hearing before the Trial Examiner below shows that counsel for the Company after the hearing was well under way and after certain exhibits of General Counsel had been received answered "yes" when asked by the Examiner, "With respect to the Boro Medical Center Agreement you wish to put that in evidence here * * *." This is an adequate proffer of evidence under any modern code of civil procedure and should suffice in an administrative proceeding.

15. The Labor Board adopted the decision of the Regional Director that the representation in respect to free medical services was "substantially correct". The Regional Director relied in making this finding entirely on a clause from the agreement between the Boro Medical Center and the Union's New York "Welfare

Plan", to which employers contributed by reason of their collective bargaining agreements. This reliance, however, was erroneous since the clause provides only for free surgical—not clinical—services. A second clause in the same agreement, set out by the Company in its exceptions to the Regional Director's report, specifically requires dependents to pay fifty percent of the regular fee for clinic diagnostic services. Counsel for the Labor Board does not dispute the accuracy of this clause.

16. The question of the accuracy of the statements made in this leaflet was concretely raised in the Company's exceptions to the Regional Director's Report on Objections and entitled the Company to litigate the question at the Section 8(a) (5) hearing.

Furthermore, the Company asserts that this leaflet sought to convey to employees the false impression that the Company had contracts with the Union in New York. Indeed, the Company insists that "the only reasonable construction that can be placed upon it—is that the company has [favorable] contracts with the Union in New York." The Labor Board found, however, that the reference to "your" union contracts "is at worst 'inartistically or vaguely worded and subject to different interpretations,' and will not suffice to establish a misrepresentation * * *" of fact sufficient to set aside the election.

We are inclined to agree with the Company in its view of the impact of this language on the Bata employee,[17] although subsequent language in the leaflet admittedly injects some ambiguity. If we accept the position of the Board that *your* was used in this context "by way of designating a class" then the language used implies that *all* New York contracts with the Union contain the listed benefits. The Board found as a fact that this is not true and, therefore, even under the Board's theory there would be a material misrepresentation of fact. See NLRB v. Bonnie Enterprises, Inc., supra.

We conclude that the Labor Board erred in not setting aside the election under its own standards: there was a material misrepresentation of fact made by a party in an authoritative position to know the truth in circumstances which prevented an effective reply prior to the election. That all New York Union contracts contain superior health, pension and wage benefits, matters of importance to employees, and that Bata has contracts with organized units in New York which afford workers there substantially greater benefits than enjoyed by unorganized Maryland employees are both representations which when false may substantially prejudice the Company. When made without adequate time for answer by one's adversary, where as few as three votes can alter the election result,[18] such statements constitute an interference with employee free choice. The Labor Board's conclusion to the contrary in the present case is not supported by substantial evidence.

## III

Aside from our decision that the Union literature distributed on April 22 prejudiced the fairness of the election, irregularities in election procedure caused by substantial omissions of Board agents responsible for balloting are themselves sufficiently serious to compel invalidation of the results.[19] The present case is clearly one where "the Board agents

---

17. The Company's position that "your" is reasonably understood to refer to the Company's New York contracts is strengthened by the use in the preceding paragraph of the leaflet of *you* five times in addressing the Company president and *your* as a possessive pronoun in conjunction with *office* to refer to the president's office.

18. The ballots cast against the Union added to the number of challenged ballots combine to come within five votes of the total for the Company. In the last representation election, conducted in December 1963, the Union lost when the Board found all those who had cast challenged ballots eligible to vote and *all* had voted against the Union.

19. The Company's objections to the mechanical aspects of the election are summarized by the Regional Director in his report:

"election conditions were such that a number of eligibles sufficient to affect the outcome of the election were deterred from voting and ineligibles were permitted to vote by: (1) Inadequate arrangements for processing the number of voters involved compounded by inclement weather; (2) Improper control of the voting lines; (3) Erroneous instructions by Board Agents with respect to the eligibility date; (4) Inadequate notice to eligibles as to the time employees must be in line in order to vote; (5) Improper delegation of authority to employees to cut off the voting line and a resulting situation where employees who were in line in time were disenfranchised and latercomers were permitted to vote.

nodded when they should have been alert and active". Shoreline Enterprises, Inc. v. NLRB, 262 F.2d 933, 946 (5th Cir. 1959).

A fair and equal opportunity for all Company employees to vote was precluded by actions of the Board agent responsible for the election. The stipulated and publicized closing hours for voting was 5:15 P.M. The Board found that shortly before this time the agent in charge of the election caused an announcement to be made on the plant public address system "that to be eligible employees must be in line by 5:15 P.M." At 5:15 the Board agent instructed three employees at the end of the line "that the line was closed and that if anyone attempted to get in line after them such persons should be directed to * * . * the agent."

The Board found, however, "that as many as 30 employees got on the end of the line" after 5:15 and "[o]ne employee states that he did not get in line until about 6:30 P.M. and voted without question." At the same time the Board found that at least one other employee, Frank Chenoweth, was improperly prevented from voting. Chenoweth was in line before 5:15 but stepped off to enter the washroom and when he returned was, according to the Board, "denied the opportunity to cast even a challenged ballot by the agent in charge."

We agree with the Company that the maladministration of the election [20] made it highly probable that eligible employees were deterred from voting while at least thirty others were allowed to vote after the polls should have been closed. When considered along with the fact that Chenoweth was improperly prevented from voting, in view of the very close results, it is our opinion that the Board abused its discretion [21] in refusing to set aside the election. Cf. Shoreline Enterprises, Inc. v. NLRB, 262 F.2d 933, 943–946 (5th Cir. 1959); NLRB v. West Texas Utilities Co., 214 F.2d 732, 740–742 (5th Cir. 1954); NLRB v. Wilkening Mfg. Co., 207 F.2d 98 (3d Cir. 1953).

It is unnecessary to consider the remainder of the Company's objections to the election. We conclude that the Board's order is not supported by substantial evidence.

Enforcement Denied.

ALBERT V. BRYAN, Circuit Judge (concurring specially):

Clearly, the Board's order should not be enforced, for the reasons, at the least, assigned in the Court's opinion. It discards as a ground of decision, however, what seems to me is a fundamental infirmity in the Board's procedure—the denial of an opportunity for the employer to be heard on decisive issues in the case before they are decided. This deprivation occurs frequently and, for me, is so destructive of due process that it should be unequivocally disapproved.

I start with the warranted finding in the opinion that here the employer's "ob-

---

**20.** In addition to confusion surrounding the closing of the polls, the Board found that "soon after the opening of the polls at the instant election it was necessary to release departments at a time later than that designated on the posted releasing schedule because the line of voters extended well over 100 feet in length. From 10:00 A.M. to 4:15 P.M. a number of first-shift voters spent an hour in line before receiving a ballot." Two employees stated that they did not go to the polls "because the line was too long and it was raining." The Board itself denies responsibility for the slow processing of

voters and concludes that "it must lie with the Employer who furnished the eligibility list out-of-date with respect to transfers."

**21.** This circuit has held that it is "for the Board, and it is not for this court, to exercise discretion as to 'whether or not the election should be set aside for irregularities in procedure.'" NLRB v. Jesse Jones Sausage Co., 309 F.2d 664, 667 (4th Cir. 1962) [quoting from NLRB v. National Plastics Prods. Co., 175 F.2d 755 (4th Cir. 1949)].

jections to the election and exceptions to the report" of the Regional Director did in truth pose "substantial and material issues with respect to the conduct or results of the election". The Board ex parte, i. e. without a hearing, had held otherwise. Incidentally, this decision was founded on the report of the Regional Director, who made his investigation of the objections ex parte and overruled them ex parte.

I heartily agree with the Court that "Due process of law demands and the present Rules and Regulations of the Labor Board provide that where there is a substantial and material issue of fact relating to the validity of a representation election that a hearing be conducted at some stage of the administrative proceeding before the objecting party's rights can be affected by an enforcement order". I am mindful, too, that there can be no judicial hearing as to the election's validity ahead of the refusal-to-bargain proceeding; the hearing I insist upon is a fair *administrative* hearing only. My departure from the opinion of the Court is in its conclusion that since the company *after the decision of the Board* had an opportunity to present evidence before the Examiner, the company was thus afforded a "sufficient hearing".

"Hearing", it is hornbook, presupposes an unpre-judged judgment on the issues at stake. Otherwise it is an obvious mockery of due process. The procedure, instantly, amounted to just that. Admittedly, the "substantial and material issues"—validity of the election—were completely and finally decided by the Board, ex parte, long before the hearing of the employer by the Examiner. It had been put aside by the Board as definitely settled, until the unfair practice case came on before the Examiner. The company was then, for the first time, allowed to put on evidence about the election, and then only before a subordinate of the Board who was thus called upon to review his superiors' determination. This post-decision "hearing" is now, I think erroneously, held to be a "sufficient hearing".

The Board's procedure cannot be justified as analogous to the practice of courts to rule upon motions for reconsideration or rehearing without the presence of the parties or the presentation of further evidence or arguments. In court such motions and rulings have been preceded by a full hearing when the issues, as the Court declares instantly, are substantial and material. But presently the sole and exclusive chance accorded the employer to submit its case fully was the hearing before the Examiner, some time after the Board's determination of the issue. The Examiner was then to decide whether the *Board* had been right—a decision to be made "under the gun" of the Board. It is as if an appellate court had rendered an opinion without a hearing and then, without vacating it, had given permission to the unsuccessful litigant to ask the lower court to allow a hearing and decide whether the appellate ruling should stand—this in turn to be re-reviewed by the appeals court.

Curtailment of a party's rights in an administrative proceeding in this manner was condemned in Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938). In discussing the fundamental requisites of an administrative hearing, with particular reference to the conduct of the Secretary of Agriculture under the Packers and Stock Yards Act, strikingly similar to the procedure of the Board here, the Chief Justice said:

> "The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and *to meet them*. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and *to be heard upon its proposals before* it issues its final command." 304 U.S. at 18, 58 S.Ct. at 776. (Accent added.)

\* \* \* \* \* \*

"Congress, in requiring a 'full hearing,' had regard to judicial standards, —not in any technical sense but with respect to those fundamental requirements of fairness which are of the essence of due process in a proceeding of a judicial nature. If in an equity cause, a special master or the trial judge permitted the plaintiff's attorney to formulate the findings upon the evidence, conferred *ex parte* with the plaintiff's attorney regarding them, and then adopted his proposals without affording an opportunity to his opponent to know their contents and present objections, there would be no hesitation in setting aside the report or decree as having been made without a fair hearing. The requirements of fairness are not exhausted in the taking or consideration of evidence but extend to the concluding parts of the procedure as well as to the beginning and intermediate steps." 304 U.S. at 19–20, 58 S.Ct. at 777.

This same thesis was expounded, and applied by refusal to enforce the Board's order because passed upon a contrary procedure, in Russell-Newman Mfg. Co. v. NLRB, 370 F.2d 980, 984 (5 Cir. 1966), the Court saying:

"Due process in an administrative hearing includes a fair trial, conducted in accordance with fundamental principles of fair play and applicable procedural standards established by law. * * * "

Nor can an employer be treated in this cavalier fashion on the score of expedition. Rights cannot be sacrificed in the name of dispatch. Nor is it legalized because the adjudicating tribunal cannot devise a better process. Cf. Russell-Newman Mfg. Co. v. NLRB, supra, 370 F.2d 980, 984; NLRB v. Trancoa Chemical Corp., 303 F.2d 456, 461 (1 Cir. 1962).

When the Court found, as it has, that the objections and exceptions of Bata were not frivolous but nevertheless had been disposed of ex parte, then the Court should have immediately set aside the Board's order. Not only was this a clear refusal of due process; it was irremediable under the Board's established procedures. A post-decision "hearing" hardly fulfills the "hearing at some stage of the proceedings" now demanded by the Court and by the precedents it cites.

"In consequence a court cannot properly enforce an order finding an employer guilty of an unwarranted refusal to bargain with a union certified in an election if it appears, with respect to challenges affecting the result, either that they were disposed of erroneously as a matter of law or that the employer raised 'substantial and material factual issues' under the Regulations and was denied a hearing that he seasonably requested. * * * " N L R B v. Joclin Mfg. Co., 314 F.2d 627, 631–632 (2 Cir. 1963). Accord, United States Rubber Co. v. N L R B, 373 F.2d 602 (5 Cir., 1967).

This withdrawal of due process from the proceeding was aggravated in the present case by the nature of the so-called sufficient hearing. The company is held to have forfeited its protestations of an unfair election because it failed to put on evidence to that effect before the Examiner. It is small wonder that the company abstained. The Examiner had not even been directed by the Board to hear the employer. By telegram the company was merely given "*leave* * * * to *request* the Trial Examiner to *permit*" it to be heard. (Accent added.) Aside from this casualness of the Board toward the interest of the employer, the Examiner himself was so perplexed as to his authority and duties that he asked for argument from the parties as to what he should do.

True, finally he invited the employer to reiterate its objections and exceptions and to submit its evidence, but the Examiner was not sure of what *could* be done with it, even if it preponderated in favor of the company. Nothing could have been accomplished; the game was over before it began. Was it reasonable to expect the Examiner to reverse the

Board? Yet the employer is cast in judgment for default in not pursuing this expectation.

I join in the result of the Court's opinion, but I regret it endorses the Board's procedure.

J. SPENCER BELL, Circuit Judge * (dissenting):

Once again my colleagues invade an area which I think is peculiarly within the expertise of the Board to overthrow a result they do not like. It is, I think, quibbling to use the two points they have chosen to find the Board clearly in error on the representation issue. The first is that the union misrepresented the fact that New York union contracts offered clinical services to the families of union members. There was no evidence that this representation in fact changed a vote, and certainly the Board is in better position to judge than this court which has only the opinion of company counsel to support its conclusion. The second is that the leaflet addressed to the company beginning "*In your New York union contracts*" misled the employees. The majority's opinion is speculation, and if I were going to speculate I would assume that after a long and bitter campaign, the employees would all know whether the company had in fact signed advantageous contracts with the union at other plants. Finally, the reversal of the Board with respect to the mechanics of the election is utterly without justification. There was not a scintilla of evidence that the persons excluded from voting were company adherents. If mistakes there were, the Board was justified in assuming they cut both ways. In NLRB v. Jesse Jones Sausage Co., 309 F.2d 664, 667 (4 Cir. 1962), this court said " * * * it is not for this court, to exercise discretion as to 'whether or not the election should be set aside for irregularities in procedure.' "

* Judge Bell prepared this opinion before his death on March 19, 1967.