The METHODIST HOME, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 78–1075.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 11, 1979.

Decided April 19, 1979.

Eric C. Schweitzer, Greenville, S. C. (Lewis T. Smoak, Ogletree, Deakins, Smoak & Stewart, Greenville, S. C., on brief), for petitioner.

Christine Weiner Peterson, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate

Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Peter M. Bernstein, N. L. R. B., Washington, D. C., on brief), for respondent.

Before WINTER, RUSSELL and WIDENER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The Methodist Home, a non-profit healthcare facility in Orangeburg, South Carolina, petitions to review and set aside an order of the National Labor Relations Board; the Board in turn cross-petitions for enforcement. The Board, in the order challenged, found that the petitioner had violated § 8(a)(5) and (1) of the National Labor Relations Act, by refusing to bargain with the Union (Local 579, AFL–CIO, CLC, Service Employees International Union), which had been certified by the Board following a representation election. The petitioner did not deny its refusal to bargain but justifies its refusal to bargain with a claim of invalidity in the certification of the Union as the bargaining agent for its employees. We deny enforcement and remand for an evidentiary hearing.

The representation proceedings began with the filing of a petition by the Union to be certified as the bargaining agent for the petitioner's employees. Following the filing of this petition, the Union and the petitioner agreed on a stipulation for a representation election in which the charge nurses, among others, employed by the petitioner were expressly excluded from the bargaining unit. This stipulation was approved by the Regional Director of the Board. Before the election was held under the stipulation, however, the petitioner filed a Motion for Collateral Investigation of the Showing of Interest. In this motion, it alleged the "[c]harge nurses" were "supervisors within the meaning of Section 2(11) of the Act" and that several of such supervisors had improperly "cooperated fully with the union and actively solicited signatures on the authorization cards used to support the union's petition." It submitted a number of affidavits providing what it asserted to be factual support for its mo-

tion. A few days later, the assistant to the Regional Director advised the petitioner that an investigation of its motion had been conducted and that as a result it had been determined the interest of the petitioner "has not been tainted by supervisory participation." On the basis of this determination, he said "the petition [of the Union to be certified] will continue to be processed."

The petitioner endeavored to secure from the Regional Director the reason for dismissal of its motion for a collateral investigation. Unable to obtain from the office of the Regional Director such reason, the petitioner finally, three days after it was notified of the denial of its motion, telegraphed the Regional Director requesting an evidentiary hearing "for the purpose of determining the appropriate unit for voting." It added in its telegram that the Regional Director's dismissal was in effect a ruling that charge nurses were not supervisors "as defined in section 2(11) of the Act" and that such ruling was "in direct conflict with the terms of the stipulation for certification upon consent election entered into by both parties and approved by you." Because of this alleged departure from the stipulation, it declared that it "consider[ed] the stipulation to be invalid and not binding" on it. Along with this telegram, the petitioner filed a motion to reconsider the Regional Director's denial of its motion. The day after the Regional Director received this telegram, he rescinded the stipulation, cancelled the election, and ordered an evidentiary hearing as requested by the petitioner. The Board in the meantime granted review of the Regional Director's Decision with the Board but sustained, without a hearing, the decision of the Regional Director (one member dissenting).

An evidentiary hearing, at which the petitioner was represented by counsel, was then held. During this hearing, the issue of whether charge nurses had a supervisory status was fully litigated. Following the hearing, the Regional Director, for reasons duly set forth, ruled that charge nurses should be included in the bargaining unit. The petitioner sought review of this ruling

of the Director. Review was granted by the Board, which, again without discussion, affirmed by a divided vote the Regional Director's decision.

The representation election was thereafter held and, after resolving the challenges, resulted in a majority for the Union by one or two votes. The petitioner filed timely objections to the election, supporting them with a position letter and a number of affidavits. The Regional Director dismissed the objections without an evidentiary hearing and certified the Union as bargaining agent. Again the petitioner sought review but this was denied, with one member dissenting. Petitioner then refused to bargain with the bargaining agent as certified by the Regional Director and the charge of refusal to bargain in violation of § 8(a)(5) and (1) of the Act followed, resulting in the order under attack by the petitioner.

As we have already indicated, the petitioner does not contest the finding of the Board that it failed to bargain. It bases its objection to the enforcement of the Board's order on the ground that the proceedings whereby the Union was certified as bargaining agent were flawed. It first contends that the Board improperly included in the bargaining unit charge nurses and their improper inclusion, carrying with it the right to vote in the representation election, was sufficient to change the result of the election. By its second argument, it would find the election voided by improper coercive conduct by the Union and its adherents rendering a fair election impossible.

The petitioner's objections to the inclusion of charge nurses in the bargaining unit were two-fold: First, it would assert that in its disposition of petitioner's motion for a collateral investigation the Board illegally repudiated the provision in the agreed stipulation which excluded from the bargaining unit charge nurses; secondly, even were the stipulation not to be considered binding, the record of the evidentiary hearing on an appropriate bargaining unit, held after the repudiation of the stipulation, provides no substantial evidence to support the Board's finding that charge nurses were to be included in such unit. We shall consider the two grounds in the order stated.

Were we confronted with a plain violation of an election stipulation by the Regional Director, we would be inclined to consider seriously the petitioner's claim in this regard. The rule has been often stated that "where the parties stipulate that the appropriate unit will include [or exclude] given jobs, the Board may not alter the unit; its function is limited to construing the agreement according to contract principles, and its discretion to fix the appropriate bargaining unit is gone." *Tidewater Oil Company v. N. L. R. B.* (2d Cir. 1966) 358 F.2d 363, 365; *NLRB v. Mercy Hospitals* (9th Cir. 1978) 589 F.2d 968, *cert. denied* —— U.S. ——, 99 S.Ct. 1221, 59 L.Ed.2d 458 (1979). We have followed this rule in this Circuit. *N. L. R. B. v. Schapiro & Whitehouse, Inc.* (4th Cir. 1966) 356 F.2d 675, 676. Nor may the clear and unambiguous language of a stipulation be overcome or modified by the so-called "community of interests" test;[1] that test is only relevant if it can fairly be said the stipulation is ambiguous. *N. L. R. B. v. Schapiro & Whitehouse, Inc., supra,* 356 F.2d at 677; *N. L. R. B. v. Midwest Television, Inc.,* (7th Cir. 1966) 370 F.2d 287, 289; *N. L. R. B. v.*

---

1. This doctrine is correctly stated in *NLRB v. Mercy Hospitals, supra,* 589 F.2d at 973:

 " * * * The community of interest doctrine is the Board's method for determining appropriate bargaining units; it consists of examining and comparing a number of factors (e. g. similarity of work performed, similarity of scale of earnings and other benefits, similarity of qualifications and skills, etc.) so that employees may be grouped in bargaining units with other employees who have a community of interests and not grouped with employees without such a community of interests. See *N. L. R. B. v. Saint Francis College,* 562 F.2d 246, 249, [96 LRRM 2134] (3d Cir. 1977). The use of this doctrine is entirely proper in those cases where the appropriate bargaining unit is disputed. But the community of interest doctrine is insufficient to override the intent of the parties in making a stipulation; it is not one of the settled Board policies which justify a refusal to accept a stipulation."

*Detective Intelligence Service, Inc.* (9th Cir. 1971) 448 F.2d 1022, 1025. Obviously, if "the inclusion or exclusion of employees within the stipulated unit [would] violate some settled Board policy or statutory provision the Board may take account of such policy or statute," and either disregard the stipulation or conform it to that "policy or statute." *N. L. R. B. v. Detective Intelligence Service, Inc., supra,* 448 F.2d at 1025. No doubt, too, the Board would have authority to rescind the stipulation if there are substantial changed circumstances making the performance under the stipulation unfair or inequitable. *See N. L. R. B. v. W. S. Hatch Co., Inc.* (9th Cir. 1973) 474 F.2d 558, 561. In fact, the Board itself accepts the foregoing principles as controlling in the implementation of stipulations for a representation election. *NLRB v. Mercy Hospitals, supra.*[2] The petitioner asserts without any contradiction by the Board that the stipulation in this case did not contravene any Board policies or statutory provisions nor was it undermined by any substantial changed conditions. Under those circumstances, it urges that the certification is void for failure of the Regional Director to conform to the stipulation in his disposition of the motion for a Collateral Hearing and later in the election itself.

■ Assuming, as the authorities manifestly suggest, that a failure to conform to the agreed election stipulation by the Regional Director would have provided ground for disregarding the certification based on an election held contrary to the terms of the stipulation,[3] the petitioner is in an awkward position to rely on the stipulation for that purpose in this case. This is not to say that we are insensitive to what must have been the feeling of frustration experienced by the petitioner as a result of its inability to elicit from the Regional Director the reason for his dismissal of its motion for a collateral investigation. But we do not think such frustration, however well-justi-

fied, necessarily warranted the petitioner in assuming that the Regional Director intended to repudiate the stipulation and its exclusion of charge nurses as valid voters at the agreed election. Certainly, the Regional Director never directly expressed any such purpose. Even if, however, it could be assumed that the Regional Director's dismissal of petitioner's motion was in essence a violation of the stipulation, that fact would simply have presented the petitioner with a choice of actions: It could either have chosen to stand on the stipulation and to have preserved its right under the stipulation to have charge nurses barred from participation in the representation election or it could have treated the Regional Director's violation as a repudiation of the stipulation and to have withdrawn from the stipulation because of such violation. It chose to follow the second option and to repudiate the stipulation, *coupling* that repudiation with a demand that the bargaining unit be established by an evidentiary hearing. Having been accorded an evidentiary hearing for the purpose of establishing the appropriate bargaining unit as it had demanded, it is no longer in a position to contest the rescission of the stipulation by the Regional Director and can only press its objection to the participation of charge nurses in the election on the basis of its contention that there is no substantial support in the record, as made at the evidentiary hearing, for including charge nurses in the bargaining unit.

■ The determination of who are supervisors and thus excluded from a bargaining unit is a matter falling within the special expertise of the Board itself, over which it has a wide discretion and in connection with which courts should give great deference to the Board's decisions. *N. L. R. B. v. Adrian Belt Co.* (2d Cir. 1978) 578 F.2d

2. In that case, the Court said, citing *The Tribune Co.,* (1971) 190 N.L.R.B. 398, 77 LRRM: " * * * The Board itself acknowledges that such stipulations are to be honored provided that they are approved by the Regional

Director and they do not violate express statutory provisions or established Board policies."

3. *See NLRB v. Mercy Hospitals, supra.*

1304, 1311.[4] That discretion of the Board is to be disturbed only if the determination is without support in the record or contrary to law. We are unable to say that the determination of the Board in this case that charge nurses were not supervisors was without support in the record or contrary to law. *See N. L. R. B. v. Doctors' Hospital of Modesto, Inc.* (9th Cir. 1973) 489 F.2d 772, 776; *N. L. R. B. v. Evangelical Lutheran Good Samaritan Soc.* (9th Cir. 1973) 477 F.2d 297, 300.

■ This leaves for consideration the petitioner's claim that it was improperly denied by the Board an evidentiary hearing on its allegations of coercive conduct on the part of the Union and its adherents, which fatally tainted the election. It identified this coercive conduct in its "Objections to Election and Conduct Affecting Results of Election," timely filed with the Board. It accompanied the "Objections" with a request for a full evidentiary hearing on its charges of coercive conduct. It later supplemented its formal "Objections" with a general statement of facts in support of its several "Objections," including affidavits from persons involved.

The Regional Director investigated *ex parte* the charges made. As a result of his *ex parte* investigation, the Regional Director dismissed the objections and certified the Union as bargaining agent on the basis of the election. On review, the Board affirmed the decision of the Regional Director. The petitioner's claim is that, on the showing made by it, it was entitled to a full evidentiary hearing on its charges. We agree.

■ The rule is well-settled that "both due process of law and the Rules and Regulations" of the Board itself demand that "where there is a substantial and material issue of fact relating to the validity of a representation election" an evidentiary

hearing should be accorded the objecting party. *N. L. R. B. v. Bata Shoe Company* (4th Cir. 1967) 377 F.2d 821, 825, *cert. denied* 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265; *Electronic Components Corp. of N. C. v. N. L. R. B.* (4th Cir. 1976) 546 F.2d 1088, 1092; *N. L. R. B. v. Georgetown Dress Corp.* (4th Cir. 1976) 537 F.2d 1239, 1244–5; *N. L. R. B. v. Americana Nursing Home & Con. Ctr., Inc.* (4th Cir. 1972) 459 F.2d 26, 27; *N. L. R. B. v. Union Brothers, Inc.* (4th Cir. 1968) 403 F.2d 883, 886–7; *N. L. R. B. v. Bristol Spring Mfg. Co.* (2d Cir. 1978) 579 F.2d 704, 707. In order to secure such an evidentiary hearing, though, the objecting party must make a "proffer of evidence 'which *prima facie* would warrant setting aside the election.'" *N. L. R. B. v. Bata Shoe Company, supra,* 377 F.2d at 826. The proffer may not be conclusory or indefinite but must relate to "'specific evidence of specific events from or about specific people.'" *Electronic Components Corp. of N. C. v. N. L. R. B., supra,* 546 F.2d at 1091. Of course, an evidentiary hearing is not required where, if all the facts contended for by the objecting party were credited, no ground is shown which would warrant setting aside the election. *N. L. R. B. v. Bata Shoe Company, supra,* 377 F.2d at 826. Neither is it sufficient for a party seeking an evidentiary hearing to do no more than question the interpretation or inferences placed on the facts by the Regional Director. *Macomb Pottery Company v. N. L. R. B.* (7th Cir. 1967) 376 F.2d 450, 453; *N. L. R. B. v. Sun Drug Co.* (3d Cir. 1966) 359 F.2d 408, 414; *N. L. R. B. v. J. R. Simplot Company* (9th Cir. 1963) 322 F.2d 170, 172. But when the party objecting to an election has made an offer of specific evidence going to the fairness of the election it is the duty of the Regional Director, under the Board's own Rules, to "carefully investigate" those claims. *Electronic Components Corp. of N. C. v. N. L. R. B., supra,* 546 F.2d

---

4. In this case, the Court said:

"Deference to the Board's expertise is particularly appropriate in cases involving Section 2(11) since that section requires that distinctions be drawn between gradations of authority 'so infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition of a 'supervisor.'"

at 1092. Whether there are such material and substantial factual issues developed in a careful investigation sufficient to require an evidentiary hearing is "a question of law and ultimately a question for the courts," *N. L. R. B. v. Bata Shoe Company, supra,* 377 F.2d at 826; *N. L. R. B. v. Bristol Spring Mfg. Co., supra,* 579 F.2d at 707 and *N. L. R. B. v. Mr. Fine, Inc.* (5th Cir. 1975) 516 F.2d 60, 63, and the failure of the Board to afford such an evidentiary hearing in an appropriate case is properly reviewable in enforcement proceedings. *N. L. R. B. v. Union Brothers, Inc., supra,* 403 F.2d at 887, n. 5; *National Labor Relations Bd. v. Poinsett Lbr. & Mfg. Co.* (4th Cir. 1955) 221 F.2d 121, 123; *N. L. R. B. v. Medical Ancillary Services, Inc.* (6th Cir. 1973) 478 F.2d 96, 98. We are convinced there was a sufficient showing by the petitioner in this case to require the granting of an evidentiary hearing.

The petitioner has instanced a number of incidents which it contends taints fatally this election. Its primary claim and the one first cited by it relates to an incident which occurred on the eve of the election itself in the Home while employees were milling about on their job. We find the circumstances of this incident sufficient to compel an evidentiary hearing without considering the other grounds listed by the petitioner as a basis for an evidentiary hearing.

The facts surrounding this incident which we conclude presented a sufficient basis for an evidentiary hearing, were set forth in the petitioner's "Objection 1" thus:

"Sometime between 11:00 a. m. and 12:00 noon on the day of the election, employee Betty Welfare approached nurse Louise Prince from behind and held a large knife to her neck. Ms. Welfare in the presence of several witnesses, then stated to Ms. Prince that 'Prince don't think nobody can cut her ass' ". Ms. Welfare also pointed the knife at Ms. Prince's lower abdomen and said she would start cutting her there since she was 'already split at one end'.

"According to Ms. Prince's affidavit * * * and the affidavits of other employees * * *, it is clear that the incident was directly related to the union activity and the well-known and opposing positions of the two women regarding the union. The effect this assault had on the employees who either witnessed or shortly thereafter learned of the assault was best described by Ms. Ardie Carn, who commented to a fellow employee that 'a cold feeling came over the floor'.

"Ms. Welfare has since been arrested and charged with assault with a deadly weapon."

The Regional Director, in his findings, does not contest the seriousness of this incident, coming as it did on the very day of an election decided by as close a result as this one was. What he concludes made unnecessary an evidentiary hearing were his findings (1) that the incident was not in earnest but was intended as a joke, (2) that the incident was entirely unrelated to the Union organization campaign or the impending election, (3) that Welfare, the aggressor in the incident, was not an agent of the Union, and finally (4) that in any event, the incident did not cast a cloud of fear or apprehension over the election sufficient for it to be said it might have influenced the result. Assuming that those are the findings on which the Regional Director dismissed the incident, the question for us is whether the Director's findings on those points rest on undisputed facts in the record.

The initial finding of the Regional Director that the entire incident was intended as a joke is clearly not one based on undisputed facts in the record or on interpretations placed by the Director on such undisputed facts. In making his finding that the incident was a mere joke, the Director relied on the bald *ex parte* statement of Betty Welfare, the offender in the incident, that the incident was a joke. She did not amplify on that statement or, if she did, the Regional Director did not note it. It was but natural that Welfare would claim such a defense. She had been arrested and charged with a criminal assault with a dangerous weapon. She could not deny the incident; there were too many witnesses.

Under those circumstances, it would have been too much to expect Welfare to profess a wrongful intent and it was understandable for her to seek to fob off her action as a joke. To have done otherwise would have been equivalent to a guilty plea to the pending charge of assault.

The Director refers, also, to his interrogation of Prince, the victim of the incident, and Brown, one of the employee-witnesses of the incident. He observed that both had at the time "laughed." But in making the deduction that such action indicated that the witness and the victim viewed lightly the incident, he gave no weight to the fact that both the witness and the victim emphasized that they did not "laugh" because they were unafraid or thought they were witnessing what they considered to be a joke or prank. It is common for a person, confronted with a frightening situation such as this one undoubtedly was to respond with a nervous "laugh." That appears to have been the way Prince and Brown describe their actions here. That would not have been unusual in such a situation. And certainly, the other undisputed reactions of the two at the time powerfully contradict any notion that Prince and Brown dismissed the incident as a mere prank. Brown told the Regional Director, as the latter recorded in his finding, that the incident so frightened her that she began "shaking." No one could construe that as the reaction of one who was witnessing what she regarded as an innocent joke. Moreover, Prince's account is equally inconsistent with any notion that the incident was to be put off as a mere playful prank. She, so long as she was at the Home with Welfare, sought to conceal her fear but, as soon as she reached the safety of her home, declared in the most unmistakable fashion her fear and apprehension. And her fear, evident at the very time of the incident by others who witnessed it, is described by the affiant Ulmer, a fellow employee who saw the incident from a distance. She said she "saw Betty [Welfare] standing over Mrs. Prince and I saw the knife, but I couldn't see clearly what exactly was going on" but she did notice that "Mrs. Prince looked awfully up-set." Mrs. Ulmer said it all "really worried" her, so much that she "went home and had a good cry."

It is interesting, too, to note the reaction of those employees who within a matter of minutes heard of the incident. These employees could only have secured their account of the incident from Brown, Prince or Ulmer—or from the three of them. In any event, no one of them had given an account of the incident consistent with a conclusion that it was considered by them as a "joke" or, after hearing of the incident, was interpreted by other employees as a joke. The statement of Carn, one of the employees who heard of the incident minutes after it occurred, is significant in this regard. She reacted almost with shock at the mere suggestion by the Regional Director that this incident might have been a joke, declaring with some indignation: "This was not a thing to joke about—you can joke with words but not with a knife. That goes beyond the limit of joking." And that seems to have been the reaction generally of the employees, for, when they heard of the incident, a "cold feeling" spread through the employees, as the Regional Director quoted one employee interviewed by him in his investigation.

Nor do we think the normal reaction would have been to regard the incident as a joke. It was too startling and shocking to be passed off as a mere mischievous trick. *See Sonoco Products Co. v. N. L. R. B.* (9th Cir. 1971) 443 F.2d 1334, 1336. To have one suddenly appear brandishing a large kitchen knife which she promptly points at one's buttocks and then threateningly moves up one's body to the throat, all the time uttering harshly menacing words about cutting one from stem to stern, has none of the characteristics of an amusing prank. This was far more than any mere verbal threat such as in *Abbott Labs. Division v. N. L. R. B.* (4th Cir. 1976) 540 F.2d 662, 665; when the threat is with a knife or a gun, this, as the witness Carn said, "goes beyond the limit of joking." One would have to have an almost bizarre turn of mind to regard such action as a joke. Yet the Regional

Director would dismiss it as such and do it in the face of a large body of contradictory evidence.

Can it be fairly said on this record that the facts developed did not make a clear issue of fact whether the action of Welfare was to be considered a joke or not? The incident itself cannot be said to carry the imprint of a joke. The person who was the victim showed unmistakenly that she did not regard it as a joke. The other persons present at the time demonstrated by their reaction how they felt about the incident. The employees who later heard of the incident felt a "cold feeling," the tell-tale mark of fear and apprehension. Only Welfare—and the Regional Director—would characterize the incident as a joke.

In essence, the issue here is one of "state of mind," "state of mind" of Welfare and, more importantly, "state of mind" of those employees who before the election, saw or heard of the incident. The incident may not be dismissed as immaterial simply because Welfare may have intended her action as a prank; the critical point is how the incident was viewed by the other employees. This is so because the issue is whether the incident had a chilling effect on the election and that turns on the reaction to the incident by the employees who were entitled to vote at the impending election. *N. L. R. B. v. Gulf States Canners, Inc.* (5th Cir. 1978) 585 F.2d 757, 759.[5] An issue of "state of mind"—whether it be that of Welfare, or of Prince or of Brown or of Ulmer or of the employees who heard later of the incident—is not one that ordinarily may be resolved by an *ex parte* investigation in a NLRB case or by summary judgment in an ordinary civil action. This was declared in a representation case similar to the present one in *Alson Mfg. Aero. Div. of Alson Indus., Inc. v. N. L. R. B.* (9th Cir. 1975) 523 F.2d 470, 472. The reason is

because it is " 'ordinarily essential, that the trier of fact be afforded the opportunity to observe the demeanor, during direct and cross-examination, of a witness whose subjective motive [or state of mind] is at issue.' " *Alson Mfg. Aero. Div. of Alson Indus., Inc. v. N. L. R. B., supra,* at 472, quoting *Consolidated Electric Co. v. United States* (9th Cir. 1966) 355 F.2d 437, at 438–39; *see also, N. L. R. B. v. Gulf States Canners, Inc., supra,* at 759.

If the issue is one of the "state of mind" of Prince, Brown, Ulmer and Carn with reference to the incident, it is manifest that the record does not support the Regional Director's finding that the incident was to be dismissed as an irrelevant and harmless prank. Perhaps under cross-examination in an evidentiary hearing, the statement of fright and "cold feeling" generated in the employees by the incident may be weakened, but for this there must be a hearing. On the other hand, Welfare's bare declaration that she intended the incident as a joke is a statement that should be tested by cross-examination, because of the obvious self-interest on her part in proclaiming such intent. In summary, the Regional Director's finding that the incident was a joke is not based on an undisputed record; to the contrary, it flies in the face of the overwhelming evidence as marshalled by him.

The second finding made by the Regional Director in support of his decision is that the incident was unrelated to any organizational activity by the Union or its adherents and was no more than a typical prank involving friends. The Director bases this finding on the fact that there was no reference to the Union or to the Union's campaign for representation at the time. This, however, is a disputed factual point, based on the record. To get the real atmosphere of the episode, one must look back to another incident that took place shortly before

---

**5.** In this case, the Court said:

"The intent test is inconsistent with the logic behind these holdings. The effects of an act intended to influence an election may be so minimal that the outcome remains unaffected. Conversely, an unintentional act may have such a deleterious effect on the conduct of an election that the result does not reflect the voters' free will. In determining whether an election should be invalidated, the focus should be on the effects of a particular act on the electorate rather than on the actor's intent."

the one with which we are primarily concerned. At this earlier episode, Prince and a number of employees had engaged in a heated discussion about the Union and its representation campaign among the employees. There must have been some discussion about violence threatened against employees who oppose the Union. This is the necessary inference to be drawn from the subsequent statements made during the discussion. Prince was an outspoken opponent of the Union in its representation campaign and in this discussion. Something must have been said to her, warning her that her outspoken anti-union feelings might result in her being cut by some adherent of the Union. Her defiant response was that "no one could cut her ass." [6] The relation of this discussion to the later incident, which occurred only a short time later, is obvious from the language of Welfare as she stood in a threatening fashion over Prince in the incident listed by petitioner in its Objections. According to the undisputed record, Welfare said at that time, "Prince don't think nobody can cut her ass." After saying this, Welfare "pointed the knife at my [Prince's] lower abdomen then back at my throat again," declaring "[y]ou (meaning Prince) are already split at one end so why not start where you are already split."

It may be that there is no direct evidence that Welfare had heard of Prince's defiant statement during the earlier argument over the Union and its campaign for representation but the circumstantial evidence that she had heard and was seeking by her dramatically threatening action to mock Prince and her defiance of the Union is compelling. How else is her almost exact regurgitation of Prince's defiant statement in her mocking way to be explained? She had to have heard Prince's earlier statement. It would be too much of a coincidence to expect that she would repeat back to Prince her precise earlier words if Prince's language had not

been reported to her. Welfare was unquestionably giving the response of the Union's adherents to Prince's defiant statement. It is true that all this may not be direct evidence that Welfare was responding to Prince's earlier statement but it is unquestionably persuasive circumstantial evidence of such fact. The Regional Director was not entitled to disregard such strong circumstantial evidence and to declare, in the face of this evidence that there was no material dispute of fact connecting the offending incident to the on-going Union organizational activity.

The third point made by the Regional Director is that the record is undisputed that Welfare's action cannot be attributed to the Union. This point is not one resolvable by strict principles of *respondeat superior* but rather by whether her "conduct was [such as to be] attributable to the union." *Certain-Teed Products Corp. v. N. L. R. B.* (7th Cir. 1977) 562 F.2d 500, 509. In this case, it is clear that Welfare was an ardent and outspoken adherent of the Union and known as such among the employees. There were, it is true, state and national representatives of the Union present in the Orangeburg area during this organizational activity but, so far as the record indicates, none of them had access to employees at work as Welfare did or were visible as Welfare was on behalf of the Union in the Home. Moreover, Welfare was not a mere volunteer adherent of the Union; she had a financial relationship with the Union. Prior to the election she had been engaged by the Union to act as its observer at the election. For this service she had been paid twenty dollars. Her very selection for this service marked her out among the employees as a Union representative and the fact that she was paid added to her status as such representative. The payment made to her was far in excess of what Welfare would have earned had she been working at the time for the petitioner.[7] Perhaps the

6. This episode was developed by the Regional Director in his investigation and is included in his decision.

7. The election apparently lasted no more than an hour. A payment of twenty dollars for no

mere designation of one as a Union observer at the election will not make the one so designated sufficiently a Union representative that her actions may be attributed to the Union, *Collins & Aikman Corporation v. N. L. R. B.* (4th Cir. 1967) 383 F.2d 722, 729, but when that person is paid and paid at a rate greater than her regular wage scale, her designation takes on a more definite relationship to the Union and one where the question of whether her actions are attributable to the Union may be a " 'substantial and material factual issue' which requires a hearing for its determination." *N. L. R. B. v. Bristol Spring Manufacturing Co.* (2d Cir. 1978) 579 F.2d 704, 707.

The Regional Director would discount Welfare's connection with the Union by referring to the fact that she had worn on one occasion stickers signifying sympathy with both the Union and with those opposed to the Union. From this, he would draw the conclusion that Welfare was neutral. The Regional Director must have made this suggestion with "tongue in cheek." Certainly, the Union would never have designated Welfare as its observer at the election if it had entertained the slightest doubt about her allegiance to the Union. If she ever wore a non-Union sticker, it was only to deride those who were wearing such stickers. She was the Union's sentinel and paid observer on the scene, for whom the Union vouched and for whom the Union must be assumed to have given a cloak of Union representation in the minds of Welfare's fellow employees. Her conduct is attributable under these circumstances to the Union.

 But even if we were to agree that Welfare's conduct might not be attributable to the Union, such fact would not mean that the election was immune from challenge by the petitioner. That fact, though it might affect the weight to be given the misconduct,[8] would not mean that such circumstance would in any event remove any taint from the election. The Board is under an obligation to see that the election is conducted under such conditions as will be conducive to the sort of free and untrammeled choice of representatives contemplated by the Act. *See Labor Board v. Tower Co.* (1946) 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322. If the conduct, though that of a mere Union adherent and not that of a Union agent or employee, is sufficiently substantial in nature to create a general environment of fear and reprisal such as to render a free choice of representation impossible, then it will require the voiding of the election. This was forcefully stated in *Home Town Foods, Inc. v. N. L. R. B.* (5th Cir. 1967) 379 F.2d 241, 244, *reh. denied and reh. en banc denied* 416 F.2d 392 (1969):

"We are not impressed with the argument that all coercive acts must be shown to be attributable to the union itself, rather than to the rank and file of its supporters. As the Board has once said, 'The important fact is that such conditions existed and that a free election is hereby rendered impossible.' "

And we made it clear in *Electronic Components Corp. of N. C. v. N. L. R. B., supra,* 546 F.2d at 1092–93, that the test

"for whether an atmosphere of fear and coercion exists is whether:

'. . . the election was held in a general atmosphere of confusion, violence, and threats of violence, such as might reasonably be expected to generate anxiety and fear of reprisal, to render impossible a rational uncoerced expression of choice as to bargaining representation. It is not material that fear and disorder may have been created by individual employees or non-employees and that their conduct cannot probatively be attributed either to the Employer or to the Union. The significant fact is that such conditions existed and that a free election was thereby rendered impossible.' *Al Long Inc.,* 173 NLRB 447, 448 (1968)."

In assessing the evidence of fright and apprehension in this connection, two circumstances should be given consideration.

---

more than an hour's work was far and away above Welfare's regular rate of pay.

8. *N. L. R. B. v. Georgetown Dress Corp., supra,* 537 F.2d at 1242.

First, it is important to note the closeness in time of the alleged misconduct to the election itself. If coercive conduct takes place on the very day of the election, particularly if within an hour or two before the election is to take place, it can be assumed to have had a far more substantial effect on the election than conduct occurring days or weeks before the election, since in the latter case the effect of the conduct may have largely been dissipated before election day. Secondly, the result of the election itself, whether won by a clear majority or by a close vote, is entitled to considerable weight in evaluating the influence of the challenged conduct on the fairness of the election. It has been repeatedly declared that in a case where "a change of only a few votes would affect the outcome of the election, less egregious actions may require a rerun of the election than [in] a case in which a clear-cut choice has emerged from the balloting." *N. L. R. B. v. Gulf State Canners, Inc., supra,* 585 F.2d at 759; *Henderson Trumbull Supply Corp. v. N. L. R. B.* (2d Cir. 1974) 501 F.2d 1224, 1230.[9]

In this case, we have coercive conduct taking place right at the work-place in plain view of a number of employees entitled to vote in the election and conduct notice of which appears to have spread by word of mouth among many of the employees. It was misconduct which took place in a matter of a few hours before the election, conduct which was the subject of conversation among the employees who were to vote in the election. It was misconduct of a serious nature which could be reasonably assumed to influence an election, particularly one which as in this case could be decided by a change of a vote or two. That the threat in

this case had a serious and substantial effect on the employees who in a matter of an hour or so were to vote is evidenced by the statement of one employee. This employee said, "[a] cold feeling came over the floor after it [the incident] happened" and everything became "very quiet." This characterization indicates the atmosphere of fear and apprehension which this frightening episode created among the employees as they prepared to vote in the representation election. The Regional Director seeks to discount this evidence by observing that when he pressed the employee who had used the expression dealing with whether the incident "could have affected the outcome of the election," replied, "[i]t could have but there's no proof it did." This was a perfectly natural answer. The employee could no more say than could the Regional Director whether the incident "affected the outcome of the election." Nor is that the question. The issue is whether it "could have." *See N. L. R. B. v. Gulf States Canners, Inc., supra,* at 759.[10] There can be no question that it "could have" and that is sufficient to require an evidentiary hearing on this serious charge.

In summary, we think that the facts asserted by the petitioner and the inferences favorable to petitioner that may be drawn therefrom are sufficient to require an evidentiary hearing as to whether (1) the incident was or was not in earnest but was intended as a joke, (2) the incident was or was not entirely unrelated to the Union organization campaign or the impending election, (3) Welfare, the aggressor in the incident, was or was not an agent of the Union, and (4) in any event, the incident did

**9.** In the latter case, the Court said (501 F.2d at 1230):

"Where, as here, an election is extremely close, even minor misconduct cannot be summarily excused on the ground that it could not have influenced the election."

**10.** In this case, the Court said:

"We are aware that, in many instances, assessing the effect of a particular action on the electorate could be a difficult, if not impossible, task. This is because detecting the subjective reaction of employees to electioneering requires an expedition into the

thought processes of the electorate, a journey that administrators and courts are ill-equipped to make. To eliminate this invitation to speculate, the Board should not attempt to plumb the subconscious. Rather, the assay should seek to find whether the questioned action by an election candidate had a tendency to influence the outcome of the voting. If the challenged action had a tendency to influence the outcome of the election, then the election should be invalidated."

or did not cast a cloud of fear or apprehension over the election sufficient for it to be said that it might have influenced its result—all to the end that the validity of the election and the correctness of certifying the Union as the bargaining agent may be determined. Enforcement is therefore denied and the case is remanded to the Board for a full evidentiary hearing on the petitioner's objections.